Dennis J. Stewart (SBN 99152)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

*Additional Plaintiff's Counsel Appear on the Signature Page*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOE KOVACEVICH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FACEBOOK, INC., a Delaware corporation headquartered in California,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

- 1 -
CLASS ACTION COMPLAINT

Plaintiff Kovacevich brings this action against Defendant Facebook, Inc. ("Facebook"), individually and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and similarly situated individuals who maintained a Facebook social media profile since 2007. Plaintiff seeks treble damages and injunctive relief for Facebook's longstanding and continuing violations of section 2 of the Sherman Act, 15 U.S.C. § 2 and violations of California state statutory and common law. Plaintiff alleges as follows based on personal knowledge, the investigation of Plaintiff's counsel, and on information and belief.

## NATURE OF THE ACTION

1.     Facebook is now the largest social media platform in the United States and in the world. As of July 2020, Facebook reported having 2.7 billion monthly active users for its main Facebook product. Facebook also has a number of other product offerings: Instagram, Facebook Messenger, WhatsApp, and Oculus. When all of these product offerings are combined, Facebook boasts 2.47 billion daily active users and 3.14 billion monthly active users worldwide. In the United States, Facebook accounts for over 45 percent of monthly social media visits. Moreover, the Facebook Messenger standalone chat app is one of the most popular mobile messenger apps worldwide.

2.     Rather than achieving market dominance through fair competition and innovation, Facebook reached its status through a systematic pattern of anticompetitive conduct. Facebook repeatedly misled its consumers about the privacy protections it provided for its users' data and leveraged its dominant market power to "acquire, copy or kill" any actual or potential competitors.

3.     Instead of paying money to use Facebook, users exchange their time, attention, and personal data, for access to Facebook's services. Facebook's business is focused on selling its users' information and attention, in quantifiable units, for money. In other words, Facebook profits by selling targeted ads based on the rich set of data about users' activities, interests, and affiliations.

CLASS ACTION COMPLAINT

Facebook collected over $70 billion in revenue in 2019,[1] almost all of which was for selling companies the opportunity to display targeted ads to Facebook's users.

4.      Recognizing the utmost importance early on, Facebook promised stringent privacy protection in its efforts to win the race for market dominance. Due to these promises, many users ultimately chose Facebook over other competitors. When users sign up for a Facebook account, they agree to certain terms. As Part of Facebook's Terms of Service, users give Facebook "[p]ermission to use [their] name, profile picture, and information about your actions with ads and sponsored content." The Terms also state that protecting user "privacy is central to how we have designed our ad system." Essentially, users provide personal information in exchange for access to Facebook's social media network and for a commitment from Facebook to protect user privacy while agreeing to receive targeted advertisements on the Facebook platform.

5.      Despite Facebook's claims about protecting user privacy, it concealed both the actual scope of the data it collected from its users and the ways in which it used that data to eliminate competition. Through these deceptions, Facebook eliminated potential competition from other social media firms and was able to gain and illegally maintain its control over the Social Network.

6.      Far from being trivial, the data Facebook collects from its users has enormous economic value. A recent majority staff report from the United States House of Representatives Antitrust Subcommittee explained that "[o]nline platforms rarely charge consumers a monetary price—products appear to be 'free' but are monetized through people's attention or with their data."[2] In public filings, Facebook describes its massive advertising earnings in terms of average revenue per user ("ARPU"). In the final quarter of 2019, Facebook's ARPU was $41.41 per user in

---

[1] *Investigation of Competition in Digital Markets,* Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, at 170 ("House Report"), Oct. 6, 2020, available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[2] *See* House Report at 18.

CLASS ACTION COMPLAINT

the United States and Canada.[3]

7.      With so much value at stake, for fear of losing its market dominance to new competitors and innovations, Facebook engaged in an illegal pattern of conduct including an "acquire, copy, or kill" strategy which, while extremely successful for Facebook, has been very detrimental to users. Facebook's anticompetitive scheme has drastically lessened, if not eliminated, competition and harmed users. Facebook founder and CEO Mark Zuckerberg observed, "[o]ne thing about startups though is you can often acquire them,"[4] reflecting his understanding that such acquisitions would enable Facebook to shield itself from competition.

8.      Rather than competing on the merits of its products, Facebook misuses valuable user data to identify and eliminate emerging competitors. Using its dominant power, Facebook discriminatorily shut off emerging competitors' access to Facebook's valuable user data if they refused to sell their businesses to Facebook. Two of Facebook's largest acquisitions, the mobile social photo app Instagram, and the mobile messaging service WhatsApp, are examples of Facebook executing its plan.   Each posed a unique and dire threat to Facebook's monopoly, each had enormous and rapidly growing user networks, and each was well positioned to encroach on Facebook's dominant market position.

9.      Consumers have suffered substantial economic injury as a result of Facebook's destruction of competition.  If Facebook had to contend with rivals, fair competition would have required Facebook to provide consumers greater value in return for their data, but Facebook instead took that data without providing adequate compensation. Through its deception and the acquisitions enabled by its deception, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have otherwise

---

[3] *Facebook Q4 2019 Results* at 4, available at
https://s21.q4cdn.com/399680738/files/doc_financials/2019/q4/Q4-2019-Earnings-Presentation-_final.pdf.

[4] House Report at 153.

CLASS ACTION COMPLAINT

1  received.

2  10. Facebook's acquisition and maintenance of monopoly power continues to harm

3  consumers. Prior to Facebook's consolidation of the social media competitors that may threaten the

4  Social Network Market, several firms vigorously competed to win over consumers by offering

5  competing products which differed in quality and other non-price attributes. Early social media

6  companies, including Facebook, competed for market share by offering privacy features to

7  consumer alongside their competing products. Absent Facebook's anticompetitive scheme, which

8  has allowed Facebook to place consumers under its monopolistic thumb, competition from

9  Facebook's rivals would require Facebook to offer products of quality superior to those it thrusts

10  upon consumers today. Instead, Facebook's anticompetitive conduct has allowed Facebook to

11  artificially stifle innovation and deprive consumers of any meaningful alternative to Facebook's

12  social media empire. As such, consumers are faced with a "take it or leave it choice" that provides

13  no choice at all: accept a Facebook of lesser quality or forgo use of the only social media platform

14  used by most consumers' friends and family members.

15  11. Facebook's monopolistic conduct violates the antitrust laws and harms consumers.

16  Facebook is dominant in the Social Network Market and has engaged in predatory and exclusionary

17  conduct in order to monopolize, causing Plaintiff and Class members to suffer substantial economic

18  injury as a result of Facebook's competition-reducing violations of law. This action seeks recovery

19  for consumers' losses and Facebook's unlawful gains, and it seeks other appropriate equitable relief

20  to prevent Facebook from continuing to destroy competition and harm consumers.

21  **JURISDICTION, VENUE, AND CHOICE OF LAW**

22  12. This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and

23  Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages or

24  disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for

25  damages to Plaintiff and members of the Class resulting from Defendant's restraints of trade and

26  monopolization of the Social Network Market described herein.

27

28

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction, and 1337(a)(antitrust); and under 15 U.S.C. § 15 (antitrust). The Court also has subject matter jurisdiction over the state law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

14.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to persons throughout the United States, including in this District. Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

15.     Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

16.     Facebook's "Terms of Service" provide that "the laws of the State of California," which includes the federal antitrust laws, govern the Terms and "any claim" between Facebook and its users.[5]

## INTRADISTRICT ASSIGNMENT

17.     Under Civil Local Rule 3-2(c) and (e), this action is properly assigned to the San Jose Division of this District because Facebook is headquartered here, and a substantial part of the events or omissions that give rise to the claim occurred in San Mateo County.

## PARTIES

*Plaintiff*

---

[5] Facebook, *Terms of Service*, https://www.facebook.com/terms.php (last accessed Feb. 11, 2021).

CLASS ACTION COMPLAINT

18.     Plaintiff Joe Kovacevich is a natural person and citizen of the State of Wisconsin. Plaintiff created a Facebook account in approximately 2008, maintains an active account, and regularly uses Facebook. Plaintiff actively uses the Facebook Messenger feature and also maintains and uses a WhatsApp account.

**Defendant**

19.     Defendant Facebook is a Delaware corporation with its principal place of business located in Menlo Park, California.

20.     Facebook is a social media company that provides online services to more than 3.14 billion users. Facebook owns and operates several business divisions, including:

- Facebook. Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to "enable people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically-ranked series of content and advertisements individualized for each person.

- Instagram. Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

- Messenger. Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- WhatsApp. WhatsApp is a secure messaging application used by individuals and businesses. Facebook acquired WhatsApp in 2014.

21.     In exchange for providing services, Facebook collects user data, which it allows advertisers to use for targeted advertising to Facebook users. Facebook's principal revenue is from targeted social media advertising that it provides to advertisers as a data broker. In 2019, Facebook

collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

22.    Facebook has over 50,000 employees and offices worldwide.

## FACTUAL ALLEGATIONS

### General Background

#### Social Media Industry

23.    At a high level, the various participants in the social media industry include the following: social media platforms, consumers, advertisers, and content providers (which can be any of the previous three types of market participants, or can be third parties).

24.    Social media platforms provide social networking, messaging, and/or media tools to consumers "designed to engage people by facilitating sharing, creating, and communicating content and information online."[6]  Social media platforms typically allow users on their networks to interact with people the users know, participate in "groups" which join users with a particular background or common interest, and display content.

25.    A common feature of the social media industry is that social media platforms typically offer their services to consumers for non-cash consideration.[7] In consideration for providing this service, social media platforms obtain valuable personal data from their users. The extent of the information obtained from users varies by social media platform, as does the disclosures about what data is obtained and the use(s) to which it is subsequently put.

26.    Social media platforms monetize the data they obtain from users by selling the data to third parties. As an example, advertisers often pay social media platforms for certain aspects of the platform's user data, in order to learn more about the demographics that are most interested in certain products. Advertisers, product manufacturers, and service providers also often pay a social

---

[6] House Report, *supra*, at 88.

[7] House Report, *supra*, at 88.

CLASS ACTION COMPLAINT

media platform to direct curated ads specifically towards particular user segments. Similarly, application developers ("app developers") purchase users' data from social media platforms to attract users that, in turn, brings profit to the developers in the forms of application purchases and ad-revenue.

**Facebook**

27.     Facebook began as a website that allowed college students to connect with their friends on campus.  Today, through its website (www.facebook.com) and smartphone application("app"), Facebook has grown into the largest social media platform in the world. Facebook's core offering to consumers is access to its social media network, which contains the individualized profiles of well over 200 million users in the United States and billions of users worldwide. In exchange for access to the only social media network that allows consumers to connect online with most of their family, friends, and acquaintances, Facebook requires users to provide their personal data and receive targeted advertisements.

28.     The personal data and user attention that Facebook obtains from consumers in this exchange is not just the users' consideration paid to use Facebook products; they are what provides significant monetary value to Facebook's enterprise. Facebook uses the data obtained from its massive user base to generate its largest source of income: selling targeted advertisements to its users.

29.     Facebook's machine learning algorithms mine patterns in the data for advertisers, which allows advertisers to reach precisely the right audience to convert into sales, user signups, or the generation of sales leads. To protect its exclusive control over user data and attention, Facebook has brought legal action against actors that have copied publicly available user data and made it available outside of Facebook.[8]

---

[8] Facebook brought one such suit as recently as November 19, 2020. *See* Jessica Romero, *Combating Clone Sites*, Facebook Newsroom, Nov. 19, 2020, available at https://about.fb.com/news/2020/11/combating-clone-sites/.

CLASS ACTION COMPLAINT

30.     The data is also monetized by commercializing access—for example, by providing application developers, content generators, and advertisers with direct access to the information embedded in Facebook's network, such as the interconnection between users, user attributes, and user behavior. That data can then be mined by these third parties.

31.     Prior to founding Facebook, Mark Zuckerberg learned the importance of privacy to consumer preference early on. While a student at Harvard University, Mr. Zuckerberg created "Facemash," which "juxtaposed the pictures of two random Harvard undergraduates and asked users to judge their physical attractiveness."[9] Notably, Facemash obtained the students' photos without their permission, "dr[a]w[ing] the ire of students and administrators alike[.]"[10] While promoting "thefacebook.com," Facebook's predecessor, Zuckerberg vowed that he had learned from his experience with Facemash building into "thefacebook.com" "intensive privacy options," which "he hoped would help to restore his reputation[.]"[11] In reality, thefacebook.com's—and later Facebook's—representations regarding privacy were part of an orchestrated scheme, designed to secure and prolong its monopoly status.

32.     From the beginning, Facebook has sought to entice consumers based on its supposed commitment to maintaining the privacy of its users' data. Unlike earlier competing social media platforms that allowed anyone interested to join anonymously or by using unverified usernames, Facebook required that those interested in joining to use their real-world identities.

33.     This qualitative distinction had clear privacy implications. Ironically, early platforms that allowed users to register anonymously or with pseudonyms caused more privacy problems for

---

[9] Alan J. Tabak, *Hundreds Register for New Facebook Website*, The Harvard Crimson, Feb. 9, 2004, available at https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/.

[10] *Id.*

[11] *Id.*

CLASS ACTION COMPLAINT

users because wrongdoers that obtained and/or used fellow users' personal information could hide behind their online (anonymous or unverified) identities.

34.    In contrast, Facebook claimed that it created a level of accountability, because users ostensibly knew who was on the other side of the screen from them and were connected to them in some way in real life. Indeed, Facebook's website "was one of the first social networks where users actually identified themselves using their real names."[12] By making users "real," Facebook claimed (and users agreed by voting with their feet) that their social interactions online were better protected and more meaningful. But all of this required Facebook to promise privacy protection in order to induce users to provide their real-world identities and data.

35.    At first, Facebook was closed to all but those users who could validate their own real-world identities, such as by verifying that he or she was legitimate via an e-mail address issued by an organization, such as a university or a firm:[13]

> It was this "realness" that became Facebook's distinguishing feature—bringing along with it – and also depending on – a perceived degree of safety and comfort that enabled Facebook to become a true social utility and build out a solid social graph consisting of verified relationships. Since "friending" (which is a link between nodes in the social graph) required both users to approve the relationship, the network fostered an incredible amount of trust. Today, many Facebook users post their cell phone numbers and their birthdays, offer personal photos, and otherwise share information they'd never do outside their circle of friends.

36.    The data Facebook has since collected derives much of its value from the ability to identify Facebook's users by their real-world identity. Other platforms, such as Twitter, have only loosely enforced identity rules, and have never required users to disclose granular details about themselves.

---

[12] *See* John Gallaugher, Getting the Most Out of Information Systems § 8.3, available at https://2012books.lardbucket.org/books/getting-the-most-out-of-information-systems-v1.4/s12-facebook-building-a-business-f.html.

[13] Gallaugher, *supra*, § 8.3.

CLASS ACTION COMPLAINT

37.     Facebook characterizes each user's disclosure of his or her identity as increasing the value of the experience for all users, who are purportedly able to benefit from others' disclosures by connecting with and following the activities of their real-world connections.[14] Disclosure also increases the market value of the information Facebook obtains from its users. Knowing the internet habits of "YankeesFan123" is less valuable than knowing the browsing habits of a specific individual whose love of the Yankees can be linked with information about his shopping habits, income, family, friends, travel, dining, dating, and a myriad of other data points.

38.     In the years since its inception, Facebook has tracked trillions of data points about consumers with a powerful data structure that it calls the "social graph." The social graph concept "refers to Facebook's ability to collect, express, and leverage the connections between the site's users, or as some describe it, 'the global mapping of everyone and how they're related.'"[15] All of the data on Facebook can be thought of as a "node" or "endpoint" that is connected to other data on Facebook:

> You're connected to other users (your friends), photos about you are tagged, comments you've posted carry your name, you're a member of groups, you're connected to applications you've installed—Facebook links them all.[16]

39.     Given Facebook's size and reach, as well as the extent of its surreptitious user data collection (discussed further below) the social graph is a unique and uniquely valuable dataset, even among the giants of the tech world. Much of this value stems from the fact that the majority of

---

[14] Apple's Senior Director for Global Privacy recently expressed skepticism that social media platforms such as Facebook encourage disclosure of personal information solely to create a richer "personalized experience" for other users. *See* Apple Privacy Letter, Nov. 19, 2020, available at https://www.scribd.com/document/485006035/Apple-Privacy-Letter#from_embed ("What some companies call 'personalized experiences' are often veiled attempt to gather as much data as possible about individuals, build extensive profiles on them, and then monetize those profiles.").

[15] Gallaugher, *supra*, (quoting Alex Iskold, *Social Graph: Concepts and Issues*, ReadWriteWeb, Sept. 11, 2007, available at https://readwrite.com/2007/09/11/social_graph_concepts_and_issues/).

[16] *Id.* (citing Alan Zeichick, *How Facebook Works*, MIT Technology Review, June 23, 2008, available at https://www.technologyreview.com/2008/06/23/219803/how-facebook-works/).

CLASS ACTION COMPLAINT

1  Facebook's social graph cannot be viewed by the public or search engines, and because it contains

2  extraordinary amounts of data that users unwittingly provided Facebook regarding their most

3  minute everyday habits.

4        40.     Facebook is a so-called "walled garden"—a closed ecosystem run by a single

5  operator. Advertisers must go through Facebook in order to reach Facebook users. And Facebook

6  can decide how much of its social graph it allows app developers, including competitors, to access.

7        41.     The personal data of Facebook's users takes many forms including data about the

8  information users share on their personal profile pages, the photos and profiles users have viewed,

9  what information users share with others, and even what users put in messages to other users. This

10  granular data all allows targeted advertising on a scale that has never before existed. Facebook's

11  platform allows advertisers to target Facebook's user base by their attributes and behavior. Third

12  party advertisers have been able to use Facebook's advertising platform to track and target

13  consumers all throughout the internet, even when Facebook users are "logged-out" of Facebook.

14        **Relevant Market**

15              **<u>The Social Network Market</u>**

16        42.     The Social Network Market is the product market consisting of social networks,

17  which are websites (and accompanying mobile applications) that: (1) facilitate users of a given

18  network finding, interacting, and networking with other people either whom the users already have

19  a personal connection to or to whom they are connected through others they already know online;

20  and (2) provide users with additional substantive features beyond the ability to communicate with

21  other users and share multimedia.

22        43.     The personal social networking service has three key elements: they (1) are built on a

23  social graph that maps the connections between users and their friends, family, and other personal

24  connections; (2) include features that many users regularly employ to interact with personal

25  connections and share their personal experiences in a shared social space, including in a one-to-

26  many "broadcast" format of personal multimedia content such as news feed posts, photos, videos,

27  

28

etc.; and (3) include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections.

44.     Search engines, such as Google, Yahoo, or Bing, are not "social networks" because they do not provide for interaction between platform members. Similarly, apps like Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or text messages, are not social networks because, although they provide for interaction, they do so only in a device-to-device manner and focus solely on delivering messages rather than facilitating a broader online social experience. Facebook itself has noted this distinction, explaining in documents provided to the House Antitrust Subcommittee that whereas the growth of Apple's iMessage is "limited by the adoption of iPhones, . . . Facebook's products can be used across devices."[17]

45.     Still other types of online networks, such as LinkedIn, are not "social networks," as that term is defined in this complaint, because they are used for a different purpose, and are used in parallel to—rather than instead of—Social Networks. Whereas LinkedIn is typically considered the dominant professional social network in the world, it is not a replacement for Facebook. This is because LinkedIn is used primarily for professional networking and employment-seeking purposes, while Facebook and its like are used primarily for non-professional, personal purposes.[18] The European Commission explained this distinction during its review of the Microsoft/LinkedIn merger: "the reasons for using a [professional service network] are different from those for using a personal social network. While the former is used to '*1. Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in touch*', the latter is used to '*1. Socialize, 2.*

---

[17] House Report, *supra*, at 136 n.752.

[18] Facebook has itself recognized this distinction in documents it provided to the House Antitrust Subcommittee. *See id.* at 133–34 n.733 ("Linkedin . . . coexist[s] in the US with similar user bases but orthogonal graphs: Facebook connects friends and family, LinkedIn connects coworkers[.]")

CLASS ACTION COMPLAINT

*Stay in touch, 3. Be entertained, 4. Kill time'*."[19] Thus, users will have *both* a LinkedIn and Facebook account, not one or the other, and this other type of network is not viewed or treated as a substitute for a Social Network.[20]

46.     There are no reasonable substitutes for personal Social Networks. Social media platforms, such as YouTube and TikTok, primarily exist to allow users to stream, share, and view content which overlaps with the significant social media element of personal Social Network. However, it lacks the element of an online community that brings together users who specifically choose to associate with one another. In addition, Social Networks, such as Facebook, provide a "rich social experience" to users through specific product features.[21] Social media platforms, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

47.     Beyond the "rich social experience" that Social Networks provide to users, consumers also use Social Networks for different purposes than other online social options, such as social media platforms. The House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized that "the specific demand for social networks is fundamentally different from the demand for other social media."[22] That is because users utilize each for different purposes: Social Networks "facilitate their users

---

[19] European Commission, *Case M.8124 – Microsoft/LinkedIn* (June 12, 2016) at ¶ 106, available at https://ec.europa.eu/competition/mergers/cases/decisions/m8124_1349_5.pdf.

[20] In addition to recognizing LinkedIn's distinct professional networking purpose, the House Antitrust Subcommittee's recent report also distinguished LinkedIn from social networks, like Facebook, based on LinkedIn's economic model. Whereas users pay for social networks like Facebook with their data, time, and attention, some features of LinkedIn, such as "LinkedIn Premium," further require users to pay a monetary fee. *See* House Report, *supra,* at 88.

[21] House Report, *supra,* at 91.

[22] *Id.* at 90.

finding, interacting, and networking with other people they already know online," whereas social media platforms "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers."[23] Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections.[24] Similarly, a user that finds a funny video of a celebrity (or other stranger) on YouTube may choose to encourage their friends and family to view that video by sharing it with them on Facebook with a note:[25]

48.     Additional factors make clear that social media platforms are used in parallel to—rather than instead of—Social Networks. For one, many consumers use both YouTube and Facebook, rather than one over the other.[26] Social media platforms make it easy for a user to share the content he or she finds on a social media platform using his or her Social Network account. By clicking the "SHARE" button that appears underneath a video on YouTube, for example, YouTube provides specific links to easily share that video on Facebook and other platforms.

49.     There is both indirect and direct evidence of Facebook's market power in the Social Network Market. Since its initial market entry, in which it competed with early social networking companies such as MySpace and Friendster (which subsequently shifted to a combined social

---

[23] *Id.* at 91.

[24] *See* Administrative Proceedings, Bundeskartellamt, B6-22/16 ¶ 312, Feb. 6, 2019 ("German Federal Cartel Office Report"), available at https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Entscheidungen/Missbrauchsaufsicht/2019/B6-22-16.pdf?__blob=publicationFile&v=5. ("YouTube is hardly ever used for other purposes (e.g. contacts to friends, messaging, looking for people the user knows, share contents")).

[25] Meira Gebel, *How to post a YouTube video on Facebook in several different ways, using YouTube's 'Share' feature*, Business Insider, Aug. 23, 2019, available at https://www.businessinsider.com/how-to-post-a-youtube-video-on-facebook.

[26] Federal Cartel Office Report, *supra*, ¶ 318 (noting that "Facebook.com and YouTube are increasingly used in parallel," and that a "large number of [users utilize] YouTube without registration and thus solely for viewing videos.

CLASS ACTION COMPLAINT

network/social media strategy, same as Facebook), Facebook has become dominant. As opposed to its defunct early competitors, Facebook has over 2.7 billion users worldwide, which is 42% of the global population (excluding China), including over 200 million users in the United States.

50.     Share of consumer time on social networks is an accurate measure of a given network's market share,[27] and more than 80% of the time that consumers in the United States spend using social networks is spent on Facebook and Instagram.[28] In addition to this demonstrably high market share, Facebook has held this dominant share for years with high barriers to new entry (discussed further below). There is a reason a movie about Facebook is entitled, "***The*** Social Network"; Facebook is now far and away the dominant player in that market.

51.     Firms in the Social Media Market generate virtually all of their value to shareholders in the form of advertising revenue. Social media companies allow advertisers to use data about a platform's users in order to deliver targeted advertisements to consumers. In particular, Facebook's anticompetitive conduct over the years has enabled it to build a network that derives its power and value directly from those users' engagement with that network. The more data that consumers fed into Facebook's social graph by communicating and interacting with each other, posting their pictures, and publishing their content, the more valuable the Facebook network became to third parties, who could advertise to Facebook's users by targeting them using the very information they provided to Facebook's network.

52.     Facebook, Twitter, Snapchat, and other social media companies all compete for the attention and data of their users, which they then convert into revenue by selling advertising. Accordingly, one of the best available metrics of market share in the Social Media Market is advertising revenue.

---

[27] See Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy*, 16:1 Berkeley Bus. L. J. 39, 87 (2019).

[28] *Id.* at 88.

CLASS ACTION COMPLAINT

53.     As measured by advertising revenue, Facebook (including Instagram) has over 85%
of the U.S. market, with the second-place competitor, Twitter, claiming *less than 3.5%* market
share. Notably, one or more of Facebook services are considered a "must have" for most social
media users, whereas other social media platforms are not.[29] This means that most social media
users that are members of competing social media platforms still have an account on a Facebook
service (if not all of them), which further means that Facebook's advertising revenues are a
conservative estimate of its already obviously-dominant market share.

### Relevant Geographic Market

54.     The United States is the relevant geographic scope of both the Social Media Market
and the Social Network Market. Social media platforms each provide services to consumers
throughout the United States, and these services do not differ by geographic area within the United
States. For example, neither Facebook nor competing social media platforms, such as YouTube,
limit the offering of their services to residents of San Jose, California, as opposed to residents of
Little Rock, Arkansas. To the extent that Facebook has competitors in the United States in the
Social Network Market, the same is true in the Social Network Market as well.

**Monopoly Power and Deceptive Conduct**

### Network Effect and High Barriers to Entry

55.     Facebook's monopoly is durable because it operates in an industry with strong
network effects and high barriers to entry.[30] A network effect is the phenomenon by which the value
or utility a user derives from a good or service depends on the number of users of the same good or
service. Network effects may be either direct or indirect. Direct network effects arise where a
product or service becomes more valuable to users as additional others use the product or service.

---

[29] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens*,
CNBC, Oct. 6, 2020, available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-
second-most-popular-social-app-for-us-teens.html.

[30] *See* House Report at 37–45.

CLASS ACTION COMPLAINT

Indirect network effects exist when greater use of a product or service incentivizes third parties in a different customer group to also engage with that product or service.

56.     As an example of direct network effects, take, for instance, an instant messaging application. Even if a messaging application has the very best encryption technology, superior look and feel, and is easy and intuitive to use, the product is worth comparatively little to a user if few other users have downloaded it. Messaging is only valuable if you can send and receive messages with people of your choosing. The more users who download the application, the more valuable it becomes to each of them. The Social Network Market exhibit clear and obvious direct network effects: "no person wants to be on a social network without other users."[31]

57.     The powerful direct network effects inherent in the Social Network Market made competition at the early stages *for* the field rather than *within* the field.[32] The House Antitrust Subcommittee's recent report recognized this point as it relates to Facebook, explaining that Facebook's network effects are "very strong" and that "there are strong tipping points in the social networking market that create competition *for the market,* rather than competition within the market."[33] A similar phenomenon has since made itself clear in the Social Media Market, such that even when users' preferences shift to non-Facebook options as their *favorite* (*e.g.*, TikTok or Snap), they still engage most often with Facebook's social media offerings (*e.g.*, Instagram) because it is the dominant, "must have" social media app.[34]

58.     The content generated by Facebook's user base reinforces also creates strong indirect network effects and, in turn, increases the value of the Facebook network to advertisers and

---

[31] *Id.* at 41

[32] *Id.*

[33] *Id.* (emphasis added).

[34] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S.* Teens, CNBC, Oct. 6, 2020, available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html.

CLASS ACTION COMPLAINT

1   Facebook itself. With each photograph, relationship status, check-in, or post by a Facebook user, the

2   Facebook network became more valuable, not just as a means of communicating with directly

3   connected acquaintances, but as a means of learning about more remotely connected ones. This

4   feedback loop enabled Facebook to use its anticompetitive strategy of consumer deception and

5   monopolistic merger conduct to achieve a scale—bolstered by revenue from third parties such as

6   advertisers and app developers that were drawn to Facebook—which substantially foreclosed

7   competition in the Social Network Market.

8        59.    As a result of this economic reality, markets that exhibit strong network effects tend

9   to be "sticky," or accompanied by high switching costs. Once a significant number of users adopt a

10  product, they will be reluctant to switch to even a superior competitive alternative, because the

11  newer offering will not deliver as much value unless many other users make the switch

12  simultaneously. This feature of network-effect markets produce a period of intense, early

13  competition, after which a single, dominant player often becomes entrenched. Facebook itself

14  suggested in an internal memorandum, with respect to social media platforms and networks, "either

15  everyone uses them, or no-one uses them."[35] A fair and level playing field during the initial phase

16  of early competition is thus crucial to maximize consumer welfare, as is a level playing field if a

17  new type of social media platform arises that threatens to supplant the old.

18       60.    Relatedly, high barriers to entry refer to fixed costs that a competitor must pay to

19  enter a market that incumbent players need not incur. Switching costs impose a barrier to entry. To

20  induce a user to adopt a new product in a market that has high switching costs, a competitor must

21  incur not only the expense of building a superior product, but also the added compensation to defray

22  a user's cost of switching. An incumbent does not incur this added cost, retaining a cost advantage

23  that is at least equal to the switching cost the competitor must absorb. Where switching costs are

24  high, the incumbent's competitive advantage is high as well.

25  _____

26  [35] House Report, *supra*, at 141.

27

28

61.     High switching costs in the Social Network Market have allowed Facebook to prolong its monopoly. As an example, Facebook users may be connected to one another exclusively through Facebook's network, leaving Facebook as the only method for users to remain in contact with one another. Faced with the possibility of losing contact with each other, Facebook users who *would* switch to another social media platform or network may choose not to do so because of these high switching costs.[36]

62.     The barrier is entry is so high that even a highly established market participant failed to establish itself as a competitor in the Social Network market. In 2010, Google launched a new product, Google+. Google+ was Google's attempt to build out a "social graph" that would leverage a common user identity across Google products, including YouTube and Gmail.

63.     With Google+, Google sought to replicate the essential product features and functionality of Facebook. The planned features for Google+ included a continuous scroll product called the "stream"; a companion feature called "sparks," which related the "stream" to users' individual interests; and a sharing app called "Circles" to share information with one's friends, family, contacts, and the public at large.

64.     Google+ represented a massive investment of resources to bring a finished, full-scale social-media network to market. Google conscripted almost all of the company's products to help build Google+. At its peak, Google+ involved 1000 employees from divisions across the country. Google even required employees to use the Google+ Hangouts video chat feature, which was supposed to help drive adoption in the tech industry and beyond.

65.     Google's attempt to compete with Facebook, however, failed because it could not attract the critical mass necessary to deliver a viable social network and therefore to overcome the network-based switching costs Facebook enjoyed as a result of its deception.[37] Indeed, Germany's

---

[36] Srinivasan, *supra*, at 89

[37] House Report, *supra*, at 89.

CLASS ACTION COMPLAINT

Federal Cartel Office has attributed Google+'s difficulty in competing with Facebook to network effects, which Facebook had built and continued to enjoy due to its misrepresentations regarding the privacy protections its users supposedly enjoyed.[38] Accordingly, even though Google+ continued as a competitor until 2018, it was never able to dethrone Facebook or even take appreciable market share away from Facebook, and all the while Facebook continued to mislead users in order to prevent them from switching to a network that offered similar features, but with better actual privacy practices.

66.    Additionally, the lack of portability of Facebook users' data presents an additional switching cost. To illustrate, "a user may upload a variety of data to Facebook, including photos and personal information, but (by Facebook's design) may not be able to easily download the data and move it to another social media site; instead, the user would have to start from scratch, re-uploading her photos and re-entering her personal information to the new platform."[39]

67.    Facebook's tight grasp on other social apps likewise presents yet another switching cost for consumers. For instance, users of the popular Spotify music streaming service frequently sign up for Spotify using their Facebook accounts.[40] But users who enroll in Spotify using their Facebook accounts "can't disconnect it"—to use Spotify after leaving Facebook, users generally must set up new accounts on Spotify.[41] In doing so, they lose access to their previous playlists, listening histories, connections with other users on Spotify, and other data.[42] This discourages would-be defectors from ultimately leaving Facebook.

68.    Many monopolists who seek to deceive consumers and anticompetitively destroy

---

[38] *Id.* at 89 n. 460.

[39] House Report, *supra*, at 26.

[40] *Id.* at 146.

[41] *Id.*

[42] *Id.*

CLASS ACTION COMPLAINT

competitors can often be disciplined by market forces. A battery manufacturer, for example, that lies about the longevity of its batteries might be able to charge an unjustified premium price for a time. But as soon as the manufacturer's deception is uncovered, consumers would quickly switch to a more fairly priced brand. However, the robust network effects present in the Social Network Market impeded market forces from overcoming Facebook's market power once Facebook had anticompetitively secured its dominance. Consumers who discovered in 2018 that Facebook had not actually been protecting their privacy as it promised could not easily switch to an alternative, because their friends and connections were all on Facebook.

69.     In addition, the Social Network Market has high financial barriers to entry. Once a social media platform like Facebook has achieved dominant market share, the amount of capital investment that would be required to challenge Facebook's monopoly would be large. A potential competitor would not only have to build its own vast network with features Facebook does not offer, but would also have to pay users' switching costs on a massive scale.

70.     Coupled with the network effects and high barriers to entry in the Social Network Markets, Facebook's anticompetitive conduct allows it to extract supracompetitive rents from users in the form of personal data and attention and deliver minimum, suboptimal privacy protections and overall quality. Facebook has been able to reap supracompetitive profits from its anticompetitive conduct without the typical pressures of competition from existing competitors or new entrants. And Facebook has been able to control and increase the amount of consumer information and attention that it demands.

71.     Internal documents show that Facebook has been keenly aware of these market features. An internal memorandum prepared in October 2018 by a senior data scientist and economist at Facebook recognized that the network effects of Facebook and its products are "very strong."[43] In a 2012 presentation, Facebook described its network effects as a "flywheel," remarking

---

[43] *Id.* at 13, 13 n.14.

that "[n]etwork effects make it very difficult to compete with us" and that its network effects get "stronger every day."[44] Similarly, Facebook's founder, Mark Zuckerberg, has made clear Facebook's recognitions that "[t]here are network effects around social products"; there are "a finite number of different social mechanics to invent" and "being first is how you build a brand and a network effect."[45]

72.     Tellingly, Facebook's own documents show its awareness that due to strong network effects and market tipping, Facebook is much less concerned with competition from other social apps in the market like Snapchat or Twitter, than from competition within Facebook's *own* family of products—Facebook, Instagram, Messenger, and WhatsApp.[46] In the case of messaging apps, Facebook's documents show that network effects can be even more extreme. And because Facebook is not interoperable with other social networks, its users face high costs to switch to other platforms, locking them into Facebook's platform.

73.     Facebook's awareness of these features of the Social Network Market shaped its competitive strategy. For example, a senior executive at the company described its acquisition strategy as a "land grab," while Zuckerberg has boasted that Facebook "can likely always just buy any competitive startups."[47] Documents show that Facebook saw Instagram and WhatsApp as maverick competitors and their acquisitions as a way to protect and strengthen the durability of Facebook's monopoly.[48]

74.     Facebook's anticompetitive conduct, described more fully below, combined with

---

[44] *Id.*

[45] *Id.* at 143.

[46] *Id*. at 384.

[47] *Id*. at 12-13.

[48] *See id*. at 149, 160

CLASS ACTION COMPLAINT

strong network effects and high barriers to entry, enabled it to obtain and maintain its monopoly over the Social Network Market in the United States. Indeed, the House Antitrust Subcommittee recently recognized that because of its anticompetitive conduct and strong network effects, "Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressures from new entrants or existing firms."[49]

**Acquiring Market Power by Deceiving Consumers about Its Privacy Practices**

75.     For years, Facebook has engaged in a pattern of deception about the amount of data it obtains and the extent of the data harvesting and use by third parties its platform has long enabled. Its deception has only recently begun to come to light.

76.     Privacy practices were a crucial form of competition in the early days of the Social Network Market. After its founding in 2003, Myspace quickly dominated the Social Network Market. By 2006, MySpace supplanted Google as the most visited website in the United States.

77.     Notably, MySpace offered an "open" platform, allowing *all* interested users to join MySpace. Moreover, MySpace users could sign up for MySpace using unverified usernames and pseudonyms.

78.     By 2007, overwhelmingly negative headlines began drawing attention to MySpace's lax privacy practices. In particular, users, parents, and critics alike attributed sexual assaults, suicides, and murders to MySpace, speculating that MySpace's open platform—which cloaked wrongdoers with relative anonymity, an added-level of covert protection—triggered these events.

79.     By this time, competitors to Myspace including Friendster, Orkut, Flip.com, Bebo, and Facebook had begun to emerge.

80.     Given MySpace's prominence in the Social Network and Market, Facebook sought

---

[49] *Id.* at 13.

- 25 -

CLASS ACTION COMPLAINT

to differentiate itself from MySpace in order to entice users to join Facebook. Facebook initially

distinguished itself on the basis of its strict privacy settings, including its closed-network approach.

Importantly, Facebook promised users that it would disclose its "information and privacy practices"

and that it would "not use cookies to collect private information from any user."[50]

81.     In 2006, some 250 million people around the world used a social media platform:

100 million used MySpace, 12 million used Facebook, and the remainder used a number of other

competitors.[51] In 2007, user growth at MySpace began to come to a halt—by mid-2007, Facebook

had begun to supplant MySpace as the most visited social media platform in the United States.[52]

82.     Facebook's representations to consumers regarding its data policies were instrumental

to Facebook's gaining market share at the expense of its rivals, including MySpace. A 2004

consumer survey revealed that a majority of Americans indicated that privacy was a "really

important issue that [they] care about often."[53] Another study focused on early Facebook users'

attitudes towards privacy, finding that they cared more about privacy policy than about terrorism.[54]

Individuals in academia compared Facebook users' satisfaction with Facebook's privacy settings to

MySpace users' satisfaction with MySpace's privacy settings, concluding that users typically

preferred Facebook's settings over Myspace's.[55]

83.     Facebook itself recognized the importance that its supposed stringent privacy

protections had in allowing Facebook to quickly amass dominance. In a November 2011 post on

Facebook, Zuckerberg explained:

_____

[50] Srinivasan, *supra*, at 39.

[51] *Id.* at 54.

[52] *Id.*

[53] *Id.* at 52 (brackets in original) (internal citation omitted).

[54] *Id.* (internal citation omitted).

[55] *Id.*

CLASS ACTION COMPLAINT

> When I built the first version of Facebook, almost nobody I knew wanted a public page on the internet. That seemed scary. But as long as they could make their page private, they felt safe sharing with their friends on online. Control was key. With Facebook, for the first time, people had the tools they needed to do this. That's how Facebook became the world's biggest community online.[56]

84.    To this day, consumers continue to care deeply about privacy. That is why many companies market their commitment to privacy as a selling point for their products and services. Apple, for instance, tells the public that "Apple believes that privacy is a fundamental human right" and that "[w]e share your belief that customers should have control over their data."[57]

85.    Despite Facebook's representations about its superior data privacy practices, Facebook spent the next fifteen years deceiving consumers about the lackluster data privacy protections that it provided to users in exchange for their data. When the scope of commercial surveillance, and the harvesting and use of user data, that Facebook's data-brokering practices enabled was first revealed in 2018, following news coverage about the Cambridge Analytica scandal, Facebook had already achieved a monopoly in the Social Network and Social Media Markets in the United States.

86.    Publicly, Facebook sought to differentiate itself by offering superior privacy protections. But behind the scenes—and entrenched in a market which provided additional protections to Facebook's monopoly in the forms of powerful network effects, high switching costs, and other significant entry barriers—Facebook created a commercial surveillance infrastructure that enabled it to dominate its competitors. This would not have been possible if

---

[56] Anita Balakrishnan, Matt Hunter, & Sara Salinas, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC News, Apr. 9, 2018, available at https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html.

[57] Apple Privacy Letter, *supra*

CLASS ACTION COMPLAINT

1    Facebook had not deceived consumers about its data privacy and commercial surveillance

2    practices.

3            87.     In 2006, Facebook introduced News Feed. The curated feed was intended as a

4    central destination so users did not have to browse through friends' profiles for updates.

5    About one million users joined a "Facebook News Feed protest group," arguing the feature

6    was too intrusive.[58]

7            88.     Facebook initially brushed off the criticism, but after continued outcry, it

8    instituted what it claimed were enhanced privacy settings that purportedly allowed users

9    greater ability to keep their activities private.[59] For example, Facebook maintained that it

10   would give users the options to block certain information—such as when a user removes

11   profile information, posts on a Facebook Wall, comments on a photo, adds a friend, removes a

12   relationship status, or leaves a group—from appearing on other users' News Feeds.[60] In

13   announcing these updates, Facebook publicly assured users that "industry-leading privacy

14   restrictions . . . have made Facebook a trusted site for sharing information."[61]

15           89.     Despite claiming to provide users with enhanced privacy protections, however,

16   Facebook increasingly made user content and information available to advertisers without

17   disclosure to users. Facebook's unrelenting deception of its users allowed Facebook to

18   continue to amass market share in the Social Network Market.

19           90.     Investigators uncovered this deception, and Facebook settled with the FTC to resolve

20   _____

21   [58] Alyssa Newcomb, *Can You Even Remember How You Coped Before Facebook's News Feed?*,
     NBC News, Sept. 26, 2016, available at https://www.nbcnews.com/tech/social-media/can-you-

22   even-remember-how-you-coped-facebook-s-news-n641676.

23   [59] *See* Facebook, *Facebook Launches Additional Privacy Controls for News Feed and Mini-Feed*,
     available at https://about.fb.com/news/2006/09/facebook-launches-additional-privacy-controls-for-

24   news-feed-and-mini-feed.

25   [60] *Id.*

26   [61] *Id.*

27                                              - 28 -

28                              CLASS ACTION COMPLAINT

the agency's charges that "Facebook deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[62] Facebook's settlement with the FTC barred Facebook from making any further deceptive privacy claims, required Facebook to get consumers' approval before it changes the way it shared their data, and required Facebook to obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years. In particular, under the settlement, Facebook was specifically:

       a)    barred from making misrepresentations about the privacy or security of consumers' personal information;

       b)    required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

       c)    required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

       d)    required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

       e)    required, within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.[63]

---

[62] Press Release, Federal Trade Commission, Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises, Nov. 29, 2011, available at https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

[63] *Id.*

CLASS ACTION COMPLAINT

91.     As another example of the promises that Facebook made—but subsequently did not keep—regarding its privacy protections, Facebook announced in 2012 that future privacy changes would require user approval through voting.[64] During a "privacy press conference," Facebook founder Mark Zuckerberg explained that Facebook is "one of the only services on the web where people are sharing pretty personal and intimate information"; that requiring users' approval for privacy changes "mak[es] it so that we can't just put in a new terms of service without everyone's permission"; and that "[w]e think these changes will increase the bonding and trust users place in the service."[65] But consistent with its pattern of deception, Facebook ultimately did not keep that commitment, choosing to end the process of requiring users' approval for future privacy changes.[66]

92.     Facebook's deception about its data privacy practices and anticompetitive string of acquisitions contributed to the rapid growth of Facebook's ever-increasing user base and increased the value of Facebook's social graph. As Facebook's VP of Product Management explained to Mark Zuckerberg in an October 2012 email, the data that Facebook collects has made Facebook progressively better at collecting and monetizing consumer data: "We know more about what people want to see because people look at more stuff on our platform. . . . the more people that use the system, the more information we have on how to make more people use the system."

93.     Facebook went public in 2012. In pursuit of revenue, Facebook began using "View Tags," which allow advertisers to track Facebook users across the Internet using cookies.[67]

---

[64] Eyder Peralta, *Facebook Will Allow Users to Vote On Privacy Changes*, NPR, June 1, 2012, available at https://www.npr.org/sections/thetwo-way/2012/06/01/154162976/facebook-will-allow-users-to-vote-on-privacy-changes.

[65] Srinivasan, *supra*, at 61–62.

[66] Dave Lee, *Facebook criticised over decision to stop public privacy votes*, BBC News, Nov. 22, 2012, available at https://www.bbc.com/news/technology-20444678.

[67] Rebecca Greenfield, *2012: The Year Facebook Finally Tried to Make Some Money*, The Atlantic, February 11, 2021, available at https://www.theatlantic.com/technology/archive/2012/12/2012-year-facebook-finally-tried-make-some-money/320493/.

CLASS ACTION COMPLAINT

1    Facebook also gave advertisers the ability to conduct more fine-grained bidding for advertising and

2    to advertise specifically to a "custom audience"—*i.e.*, a list of specific users provided by the

3    advertiser. Facebook did not disclose that its user data practices allowed third parties to track

4    Facebook users across the internet using cookies.

5           94.    At the time of Facebook's 2012 IPO, its filings with the SEC indicated that the

6    company had 845 million monthly active users and that its website featured 2.7 billion daily likes

7    and comments.[68]

8           95.    Facebook later combined user content with other third-party data, thereby

9    deanonymizing the third-party data. For example, in April 2013, Facebook created information

10   dossiers on millions of users and nonusers alike. The dossiers included names, health information,

11   information about neighbors, and proclivities. Facebook did not disclose the dossiers to users (or

12   even the fact of the dossiers' existence), using them instead to allow advertisers to target users with

13   more precision.[69] Users were unaware of the extent of Facebook's commercial surveillance and did

14   not first begin to become aware until the news of the Cambridge Analytica scandal broke—in

15   March 2018, the overwhelming majority of Facebook users incorrectly believed Facebook collected

16   data only when logged in.[70]

17          96.    Facebook engaged in this continued pattern of deception with the specific intent to

18   monopolize the Social Network Market and ultimately to maintain its monopoly. Facebook

19

20   ───────────────

21   [68] Facebook's Form S-1 Registration Statement under the Securities Act of 1933,
     https://www.sec.gov/Archives/edgar/data/1326801/000119312512034517/d287954ds1.htm.

22

23   [69] Tim Peterson, Facebook Will Remove Advertisers' Other Third-Party Data Option, But
     Loopholes, Questions Remain, DigiDay, Apr. 6, 2018, available at
24   https://digiday.com/marketing/facebook-will-remove-advertisers-third-party-data-option-loopholes-
     questions-remain/.

25   [70] Paul Hitlin & Lee Rainie, *Facebook Algorithms and Personal Data*, Pew Research Center, Jan.
     16, 2019, available at https://www.pewresearch.org/internet/2019/01/16/facebook-algorithms-and-
26   personal-data/.

27

28   CLASS ACTION COMPLAINT

succeeded in deceiving consumers long enough to solidify its market power in the Social Network

Market. By the time Facebook's deception about its lackluster data privacy practices was revealed

in 2018 during when the Cambridge Analytica scandal broke out it had achieved unrivaled

dominance.

### Government Actions Against Facebook

97.     It was only after news of the Cambridge Analytica scandal broke that Facebook's

continued deception regarding its sharing of the data of its users' friends began to come to light. In

its 2019 complaint against Facebook, the DOJ cautioned that "[t]he full scale of unauthorized

collection, use, and disclosure of consumer information resulting from Facebook's conduct is

unknown due, at least in part, to the company's lack of recordkeeping." *Id.* ¶ 126. The DOJ

expressly noted Facebook's falsehoods regarding its sharing of the data of its users' data in the

DOJ's 2019 complaint against Facebook for Facebook's breach of its 2012 settlement agreement

with the FTC. *See United States, v. Facebook, Inc.*, 1:19-cv-02184 (D.D.C.), Dkt. 1, ¶¶ 5–9.

98.     By the time Facebook's deception started to come to light in 2018, however,

Facebook's social media monopoly was fully entrenched with over 217 million users. That year,

Facebook earned over $55 billion in revenue, almost completely from targeted advertising made

more valuable to Facebook and third parties due to a lack of meaningful data privacy protections.

99.     On July 24, 2019, the FTC and the Department of Justice announced that Facebook

would pay a $5 billion penalty, and submit to new restrictions and a modified corporate structure, to

settle charges that the company had "deceiv[ed] users about their ability to control the privacy of

CLASS ACTION COMPLAINT

1  their personal information."[71]

2  100.   The largest penalty ever imposed by the FTC before that time was $275 million. The

3  FTC explained:

4  101.   "Facebook monetizes user information through targeted advertising, which generated

5  most of the company's $55.8 billion in revenues in 2018. To encourage users to share information

6  on its platform, Facebook promises users they can control the privacy of their information through

7  Facebook's privacy settings."[72]

8  102.   "[But] Facebook repeatedly used deceptive disclosures and settings to undermine

9  users' privacy preferences . . . . These tactics allowed the company to share users' personal

10  information with third-party apps that were downloaded by the user's Facebook "friends." . . . In

11  addition, the FTC alleges that Facebook took inadequate steps to deal with apps that it knew were

12  violating its platform policies."[73]

13  103.   The FTC's 2019 charges made clear that Facebook had egregiously violated the

14  FTC's 2012 order, described above, by repeatedly using deceptive disclosures and settings to

15  undermine users' privacy preferences.

16  104.   Consumers had relied on Facebook's 2012 settlement with the FTC in deciding to

17  continue to give Facebook access to their personal data in exchange for use of Facebook's platform.

18  But by the time consumers learned that Facebook had violated that settlement, they could not

19  reasonably switch to a comparable social media platform. Facebook had already achieved monopoly

20  power in the Social Network Market, and network effects, high barriers to entry, and immense

21  switching costs made more likely that Facebook's monopoly would be maintained. Although

22  _____

23  [71] Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, July 24, 2019, available at https://www.ftc.gov/news-events/press-

24  releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions.

25  [72] *Id.*

26  [73] *Id.*

27

28  CLASS ACTION COMPLAINT

market forces can sometimes reign in companies who deceive users, the Social Network Market' unique features made it more difficult for the market to discipline Facebook for violating its commitments to consumers.

105.    Notwithstanding widespread outrage after the Cambridge Analytica scandal, the vast majority of Facebook users have continued to use Facebook and its family of products. A consumer survey revealed that 58.1% of Facebook users did not change their behavior on Facebook at all, despite learning of the Cambridge Analytica scandal.[74] Of the 41.9% of Facebook users that *did* change their behavior, only 9.6% deleted or deactivated their Facebook accounts:[75]

106.    The reason that the vast majority of Facebook users have continued to use Facebook and its products despite Facebook's complete and utter disregard for its users' data, as partially illuminated in the Cambridge Analytica scandal's aftermath, is clear. As Facebook was keenly aware, a social network really only has value if users' friends use it too. And once a social network reaches critical mass, it wins in this market characterized by network effects and users generally no longer have a viable alternative to the social graph, "as there is no reason for users to start using a social network if there is no one there with whom they can connect."[76] Thus, notwithstanding widespread outrage after the Cambridge Analytica scandal, few Facebook users stopped using Facebook, because there was no longer any other viable platform to use.

---

[74] Julie Beck, *People Are Changing the Way They Use Social Media*, The Atlantic, June 7, 2018, available at https://www.theatlantic.com/technology/archive/2018/06/did-cambridge-analytica-actually-change-facebook-users-behavior/562154/.

[75] *Id.*

[76] House Report, *supra*, at 89.

CLASS ACTION COMPLAINT

1

**Anticompetitive Conduct**

2

107.    While Facebook increased its market power through consumer deception about its

3

data privacy practices, Facebook also sought to protect and expand its monopoly by regularly

4

destroying and acquiring competitive threats, and it used its market power and data advantage to

5

anticompetitively achieve its monopolistic objectives.

6

108.    Since its founding in 2004, Facebook has acquired at least 63 companies,[77]conduct

7

that has only recently been revealed as distinctly anticompetitive in that (as has been revealed in the

8

last two years) Facebook used the data it deceptively obtained from users to identify nascent

9

competitors and then to target them for acquisition or destruction. These anticompetitive

10

acquisitions were enabled by and the result of Facebook's deception.

11

**Misuse of Consumer's Data to Identify Competition**

12

109.    Facebook used the data that it obtained from users to track the websites and apps

13

visited by its users—often without full disclosure—in order to identify which upstart competitors

14

were gaining traction so that it could target them for acquisition or destruction. Facebook "led a

15

sustained effort to surveil smaller competitors to benefit Facebook . . . steps taken to abuse data, to

16

harm competitors, and to shield Facebook from competition."[78] In fact, Facebook intentionally

17

developed its ability to surveil users to aid its acquisition strategy, which has continued from the

18

point at which it first emerged as the largest Social Network through today.

19

110.    Historically, Facebook had used internal data and data from Comscore, a data

20

21

22

23

24

_____

25

[77] *See id.* at 149.

26

[78] *Id.* at 166.

27

- 35 -

CLASS ACTION COMPLAINT

28

analytics and measurement firm, to track the growth of competitive threats.[79] But Facebook's efforts were only as good as that underlying data. Accordingly, Facebook determined that by securing more robust data from its users through increased surveillance, Facebook could better remove future competitors from the social media chessboard.

111.    Accordingly, in April 2012, Facebook's Director of Growth, Javier Olivan, emailed Zuckerberg and Chris Cox, Facebook's Chief Product Officer, about improving Facebook's "competitive research." Olivan indicated that "getting our data in great shape is going to require effort," but that Facebook's building its own system for identifying competitive threats would "allow us to get 10x better at understanding" competitive threats to Facebook's dominance of mobile devices.[80] Olivan explained:

> I keep seeing the same suspects (instagram, pinterest, …) [sic] both on our competitive radar / platform strategy as wins . . . I think having the exact data about their users [sic] engagement, value they derive from [Facebook] . . . would help us make more bold decisions on whether they are friends or foes. Back to your thread about "copying" vs. "innovating" we could also use this info to inspire our next moves.[81]

112.    Zuckerberg responded "Yeah, let's do it." Underscoring the importance to Facebook of utilizing its users' data to identify competitive threats, Zuckerberg committed to "find[ing] some time periodically during my weekly reviews to go over this stuff."[82]

**Facebook's Use of Onavo Comes to Light.**

113.    In 2013, Facebook acquired Onavo, an Israeli mobile web analytics company that ran a virtual private network ("VPN"), for $115 million. Prior to acquiring Onavo, Facebook had relied on Onavo's surveillance of Facebook's competitors for years, such as during the process of

---

[79] *Id.* at 160–66.

[80] *Id.* at 161.

[81] *Id.*

[82] *Id.*

CLASS ACTION COMPLAINT

acquiring Instagram, and Facebook ultimately acquired and used Onavo's assets to track potential competitors through non-public, internal, real-time data about its users' engagement, usage, and time spent on other apps.[83] Tellingly, at the time it acquired Onavo, Facebook did *not* intend to place Onavo's employees in Facebook's Data Analytics team. Instead, in acquiring Onavo, Facebook planned to place Onavo's employees, including its cofounder, Guy Rosen, under Facebook's Growth team, reporting to Javier Olivan.[84]

114.   To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in VPNs, data compression, and even in mobile privacy apps. Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the substantial barriers to entry protecting Facebook from new entrants and competition.

115.   Facebook used Onavo's data to: (a) identify and target competitors from which Facebook could demand concessions; (b) identify and target competitors to whom Facebook would completely deny access to its platform; and (c) identify and target competitors that Facebook would remove from the competitive landscape entirely through acquisition.

116.   Facebook immediately began integrating Onavo's applications into both its business operations and its acquisition strategy. Facebook, for example, began analyzing data secretly collected from Onavo's Protect software, which was a massive surveillance and data collection scheme disguised as VPN software. Billed as a way to "keep you and your data safe," Onavo Protect in fact monitored all web and mobile application traffic on a user's mobile device.

---

[83] Betsy Morris and Deepa Seetharaman, *The New Copycats: How Facebook Squashes Competition From Startups*, Wall Street Journal, Aug. 9, 2017, available at https://www.wsj.com/articles/the-new-copycats-how-facebook-squashes-competition-from-startups-1502293444.

[84] House Report, *supra*, at 161.

CLASS ACTION COMPLAINT

117.     When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app. By February 2018, Onavo apps had been downloaded thirty-three million times across both iOS and Android.

118.     Ultimately, the world learned the truth about the extent of commercial surveillance that technology like Onavo's made possible for Facebook. In August 2018, Apple removed Onavo from its app store following reporting that Facebook was using the app to track users and other apps. Apple ejected Facebook's Onavo app from its marketplace because it violated Apple's rules prohibiting apps from using data in ways far beyond what is required to run the app and provide advertising. In other words, because Onavo Protect was leveraging far more data than any VPN could conceivably need, it was clear that the true purpose of the app was to spy on Onavo users, and Apple would not allow it. An Apple spokesperson said the company intended to make "it explicitly clear that apps should not collect information about which other apps are installed on a user's device for the purposes of analytics or advertising/marketing and must make it clear what user data will be collected and how it will be used."[85]

119.     The amount of commercial surveillance that Onavo's technology enabled was jaw-dropping. Facebook's Onavo Protect app reported on users' activities whether their screens were on or off; whether they used WiFi or cellular data; and even when the VPN was turned off. There was simply no rational relationship between the data collected and the purported purpose of the application. Put simply, a VPN that collected data even when the VPN was off was an obvious subterfuge for spying on user behavior.

---

[85] House Report, *supra*, at 161.

CLASS ACTION COMPLAINT

120.     Facebook tried to circumvent Apple's ban by repackaging its Onavo spyware as a Facebook Research VPN app. Facebook sidestepped the App Store by rewarding teenagers and adults when they downloaded the Research app and gave it root—superuser—access to network traffic on their mobile devices. Facebook has been leveraging its Onavo code in similar ways since at least 2016, administering the program under the codename "Project Atlas"—a name suited to its goal of surveilling app usage on mobile devices in real time.

121.     When the news broke in January 2019 that Facebook's Research apps were repackaged Onavo apps designed to spy on users, Facebook immediately withdrew the programs from the Apple App store. Apple again concluded that Facebook had tried to violate its policies by obtaining a level of administrative privileges on an iPhone that would have been designed for a company's internal IT department. In addition to Onavo's Protect app, Facebook has attempted to deploy its surveillance software as other forms of utility applications that require extensive or privileged access to mobile devices. For example, Facebook released the Onavo Bolt app, which locked apps behind a passcode or fingerprint while it covertly surveilled users— and sent Facebook the results. Facebook also shut that app down the very day that its surveillance functionality was discovered. The Onavo Bolt app had been installed approximately 10 million times.

122.     Facebook has used extensive surveillance of user behavior in order to identify and target nascent competitive threats. Using the data it obtained from Onavo and other sources, Facebook then eliminated upstart competitors by demanding concessions in agreements, by denying access to vital sources of data and information on Facebook's platform, or by acquisition. The technology Facebook obtained from Onavo and other data brokers allowed Facebook to protect and further its market dominance. Some of the ways that Facebook exploited users' data that Facebook obtained from Onavo or other sources to inform Facebook's anticompetitive "copy, acquire, kill" strategy are detailed below. Notably, however, the extent to which Facebook used ill-gotten user data to pursue these strategies was not known until the last two years.

CLASS ACTION COMPLAINT

**Discriminatory Practices and Anticompetitive Acquisition Strategy**.

123.     In addition to the surveillance Facebook conducted through Onavo, Facebook's "copy, acquire, kill" strategy was also built on the company's willingness to use deceptively-obtained user data to target key competitors by discriminatorily denying them access to the "Facebook Platform." The Facebook Platform allows third parties to develop products that work in conjunction with Facebook. Zuckerberg has described Facebook Platform's purpose as "mak[ing] Facebook into something of an operating system so you can run full applications[.]"[86]

124.     Over the last decade, Facebook has also used discriminatory access to its social graph and selective enforcement of its Platform policies to prevent possible competitors from emerging, continuing to harm consumers at every turn. As Zuckerberg said regarding identified competitive threats: "I think the right solution here is to just be a lot stricter about enforcing our policies and identifying companies as competitors."[87]

125.     Facebook did exactly that, using supposed violations of Facebook's policies as a pretext to cut off social apps that had become too popular, like Vine, Stackla, Ark, and MessageMe. Facebook cut off these social apps' access to Facebook's social graph because Facebook was fearful that continued access would allow these apps to launch their own competing services that would challenge any one of Facebook's ever-expanding cache of products.[88] As an example, Facebook penalized Ark, a third-party app that Facebook users could use in conjunction with Facebook, for the manner in what Ark accessed data on Facebook.[89] A former Facebook employee explained: "It

---

[86] David Kirkpatrick, *Facebook's plan to hook up the world*, CNN Money, May 29, 2007, available at https://money.cnn.com/2007/05/24/technology/facebook.fortune/.

[87] House Report, *supra,* at 167.

[88] *Id.* at 166.

[89] *Id.* at 169.

CLASS ACTION COMPLAINT

1    seemed clear that leadership imposed [a] more severe punishment against Ark because Mr.

2    Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring an acquisition of

3    Ark at the same time as it was being investigated for policy violations."[90]

4         126.   By the end of 2011 and the beginning of 2012, Facebook executives debated a plan

5    to prevent third-party developers from building their own competing social media networks that

6    might be capable of generating engagement and social media data independent of Facebook

7    Platform. Social media mobile applications, such as Line, WeChat, and Instagram were creating

8    their own independent user bases and were becoming emerging competitive threats.

9         127.   Facebook's solution to address these potential competitors was a scheme to disrupt

10   the growth of these applications by first attracting third-party app developers to build applications

11   for Facebook Platform and then ultimately remove their access to the application programming

12   interfaces ("APIs"), which removed those developers' access to the functionality of Facebook's

13   social media network as well as information about Facebook users' friends and extended network,

14   users' interactions with each other, and users' newsfeed posts. This API access was the central

15   value proposition of Facebook Platform. If developers created apps that enhanced the value of

16   Facebook's social network, they would in return receive the benefits of access to the functionality

17   of Facebook's social media network, as well as to interconnections and interactions among

18   Facebook's users—Facebook's social graph.

19        128.   Facebook's shut off of API access deprived app developers of access to the APIs that

20   were most central to their applications, such as Facebook's "Friends" and "Timeline" APIs, as well

21   as other vital APIs, including those relating to messaging. Facebook's identification of competitive

22   threats and removal of access to these APIs halted the growth of tens of thousands of third-party

23   applications that relied on these essential APIs and were, in Facebook's view, threatening

24   Facebook's monopoly by eroding the substantial barriers to entry that protected Facebook's

---

[90] *Id.*

CLASS ACTION COMPLAINT

business. Facebook's scheme prevented competitive third-party applications from buying consumer data from Facebook, either through its platform APIs or through its advertising platform. As a Facebook executive explained in 2012, Facebook would "not allow things which are at all competitive to 'buy' this data from us."

129.    In May 2012, Zuckerberg decided to use the threat of shutting off potential competitors' access from Facebook Platform to extract social media user data. He instructed executives to demand "reciprocity" agreements from major competitors that used Facebook's platform. Facebook then began to block competitors from using its platform and thereby obtaining access to Facebook's data about consumers. Competitors such as Twitter, Instagram, Pinterest, and Foursquare were required to hand over their most valuable asset—their social media data—to their rival Facebook in order to retain access to Facebook's APIs and advertising platform.

130.    Facebook planned to block competitors from using its platform, thereby preventing them from eroding the substantial barriers to entry and network effects that protected Facebook's market power. For the companies with social media network data that Facebook needed to further extend its dominance, Facebook would coerce them into agreements to share their most valuable social data with Facebook. If they refused, Facebook would blacklist them and take it from them anyway with its own crawling software that would scrape their public-facing site for information. What began as a negotiation strategy to extract social media data from rivals became the foundation of Facebook's Platform strategy. For competitors that posed enough of a threat to create their own rival network, Facebook required them to hand over the only leverage they had—the social media data they derived from their users' engagement.

131.    Facebook's willingness to copy and penalize competitors through discriminatory access to its social graph also made it easier for Facebook to acquire competitors at a reduced price. For example, during negotiations to acquire Instagram between Zuckerberg and Kevin Systrom, Instagram's Chief Executive Officer, Zuckerberg tied Instagram's response to Facebook's advances to Instagram's continued access to Facebook Platform and Facebook's social graph:

> At some point soon, you'll need to figure out how you actually want to work with us. This can be an acquisition, through a close relationship with Open Graph, through an arms length relationship using our traditional APIs, or perhaps not at all . . . Of course, at the same time we're developing our own photos strategy, so how we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well.[91]

132.   Similarly, in an earlier conversation between Systrom and Matt Cohler, an Instagram investor and former senior Facebook adviser, Systrom and Cohler discussed the possibility that Instagram's response to Facebook's acquisition efforts could affect Instagram's access to Facebook Platform down the line."[92] In discussing how to engage with Zuckerberg regarding Facebook's advances, Cohler cautioned: "we need to make it as hard as possible for fb to mess with our ability to get distribution on the platform[.]"[93]

133.   In 2015, Facebook cut off all public access to the Friends and News Feed APIs. Facebook had already extracted valuable social media network data from dozens of competitors in the run-up to the announcement and ultimate removal of the APIs. This move allowed it to coerce incipient competitive threats to hand over their social media network data. Facebook denied API access to thousands of potential competitors, and in the process ensured that its platform would be the only viable platform upon which a third-party social media application could be built.

134.   After the announcement and through the full removal of the APIs in April 2015, Facebook made a series of agreements that forced certain competitors to hand their data over to Facebook. For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs. Facebook's

---

[91] *Id.* at 164.

[92] Production of Facebook to H. Comm. on the Judiciary at FB-HJC-ACAL-00101440, Feb. 13, 2012, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

[93] *Id.*

CLASS ACTION COMPLAINT

Whitelist and Data Sharing Agreements included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access. These Agreements were only offered in exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity").

135. That year, Facebook provided Whitelist and Data Sharing agreements to the dating apps Tinder and Hinge. It also secretly signed Whitelist and Data Sharing agreements with other third-party developers, including Netflix, Nissan, and Lyft. In total, dozens of app developers entered into such agreements with Facebook.

136. Consistent with Facebook's ploy to maintain its monopolistic grip on the Social Network Market by deceiving consumers about its privacy practices, Facebook's Simon Cross marketed these changes to its third party access policies as triumphs that bolstered the security of its users' data. Facebook announced a new slogan, "'People First', because 'if people don't feel comfortable using Facebook and specifically logging in Facebook and using Facebook in apps, we don't have a platform, we don't have developers.'"[94] In reality, however, Facebook described these changes—and its marketing of these changes—as "the Switcheroo Plan": "Facebook bundled in the decision to cut off third-party access to user data with other unrelated privacy updates, and explained it all under the new slogan "people first."[95] "The fact that user data would still be available to some third parties, as long as the companies gave Facebook enough money and didn't

---

[94] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data to Apps*, TechCrunch, Apr. 28, 2015, available at https://techcrunch.com/2015/04/28/facebook-api-shut-down/.

[95] Elena Botella, *Facebook Earns $132.80 From Your Data per Year*, Slate, Nov. 15, 2019, available at https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html.

CLASS ACTION COMPLAINT

1    pose a competitive threat, was conveniently elided."[96]

2          137.    Absent these agreements and Facebook's overall scheme to eliminate nascent

3    competitors, other companies could have created their own social media networks. As the amount

4    of user data was generated and monetized on these other networks, the substantial barriers to entry

5    in the Social Media Market would have eroded. But because Facebook could coercively demand all

6    of the social media user data generated on a competing platform, the Whitelist and Data Sharing

7    Agreements ensured that competitive threats could not challenge Facebook's stranglehold over the

8    social media network data, which Facebook obtained by leveraging its social media monopoly.

9          138.    In all of its conduct surrounding potential acquisitions, Facebook intentionally

10   surveilled, copied, acquired, and killed competitors with the specific intent, and result, of destroying

11   competition. Facebook acquired and maintained its monopoly due to its predatory and

12   anticompetitive conduct that went on during its string of acquisitions, with a specific intent to

13   monopolize, and with a dangerous probability at the outset and, ultimately, its present day success

14   in obtaining and maintaining its market power.

15                              **Instagram**

16         139.    Facebook used the undisclosed surveillance of its users to identify Instagram as a

17   threat and ultimately to acquire the company. Instagram was a photo-sharing mobile application

18   founded by Kevin Systrom, which allowed users to check in, post plans, and share photos. The

19   photo-sharing feature immediately became the app's most popular.

20         140.    Instagram was launched on iOS, Apple's mobile device operating system, in 2010.

21   That very day, Instagram became the top free photo-sharing app on Apple's App Store, racking up

22   twenty-five thousand downloads. By the end of the first week, Instagram had been downloaded

23   100,000 times, and by mid-December 2010, its total downloads had reached one million. The

24   timing of the app was impeccable, as the iPhone 4, with its improved camera, had launched just a

26   [96] *Id.*

CLASS ACTION COMPLAINT

few months earlier in June 2010. By March 2012, the app's user base had swelled to 27 million. That April, Instagram was released on Android phones and was downloaded more than one million times in less than one day. At the time, Instagram was also in talks to receive another $500 million funding round.

141.    Internally, Facebook carefully tracked Instagram's rise, including through intelligence that it received from surveilling Facebook users' behavior and that it obtained from Onavo.[97] Instagram clearly posed a competitive threat to Facebook's dominance, especially due to its superior photo-sharing feature. Facebook recognized, thanks in part to the commercial surveillance data it was able to obtain regarding Facebook users, that Instagram could become a competing social media network that could rival Facebook in the amount of user engagement and social media data it could produce and monetize.

142.    Both line employees and high-level executives at Facebook recognized Instagram as a competitive threat. In an internal Facebook message, one engineer mused that "Instagram is eating our lunch. We should've owned this space, but we're already losing quite badly."[98] At an internal meeting with Facebook employees, Zuckerberg put it bluntly: the "bad news is that [Instagram is] growing really quickly, they have a lot of momentum, and it's going to be tough to dislodge them."[99]

143.    Consistent with its strategy of "copying" would-be competitors, Facebook initially attempted to create its own product that competed with Instagram. By June 2011, Facebook had

---

[97] Mike Swift, *Facebook's history with Onavo resonates for privacy experts worried about Giphy purchase*, mlex Market Insight, June 23, 2020, available at https://mlexmarketinsight.com/insights-center/editors-picks/area-of-expertise/data-privacy-and-security/facebooks-history-with-onavo-resonates-for-privacy-experts-worried-about-giphy-purchase.

[98] House Report, *supra*, at 163.

[99] *Id.*

CLASS ACTION COMPLAINT

begun developing its own photo-sharing app.[100] One Facebook employee referred to Facebook's anticipated photo-sharing app as "an Instagram clone."[101] Facebook subsequently released Facebook Camera, a standalone app allowing users to shoot, filter, and share photos from their mobile devices.[102]

144.    In addition to "cloning" Instagram, Facebook determined there was another way to hedge its bets, protect its monopoly, and neutralize the competitive threat of Instagram: simply buying Instagram outright. Accordingly, after direct talks with Mark Zuckerberg, Facebook offered to purchase Instagram for $1 billion in April 2012.

145.    In addition to the $1 billion price tag, another consideration motivated Instagram's consideration of Facebook's acquisition offer: Facebook's aggressive and anticompetitive threats, which Facebook was safe to make due to its status as a monopolist.

146.    During negotiations between Facebook and Instagram, Zuckerberg warned Kevin Systrom, Instagram's Chief Executive Officer, that "[a]t some point soon, you'll need to figure out how you actually want to work with us. . . . [H]ow we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well."[103] In a separate communication with Matt Cohler—an Instagram investor and Facebook's former Vice President of Product Management—Systrom inquired whether Zuckerberg "will go

---

[100]MG Siegler, *Behold: Facebook's Secret Photo Sharing App*, TechCrunch, June 15, 2015, available at https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.238331010.40941203.1606233329-687565188.1605321310.

[101] House Report, *supra*, at 163.

[102] Josh Constine, *FB Launches Facebook Camera – An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*, TechCrunch, May 24, 2012, available at https://techcrunch.com/2012/05/24/facebook-camera/.

[103] House Report, *supra*, at 163–64.

CLASS ACTION COMPLAINT

1    into destroy mode if I say no" to Facebook's acquisition offer.[104] Cohler responded that Zuckerberg

2    would "probably" go into "destroy mode" and "conclude that it's best to crush Instagram[.]"[105]

3    Cohler further lamented that "I don't think we'll ever escape the wrath of [M]ark" Zuckerberg.[106]

4        147.   Clearly crushed into submission and fearful of Facebook's "wrath," Instagram

5    acceded to Facebook's acquisition demand. Facebook consummated the deal immediately prior to

6    its IPO.

7                   **WhatsApp**

8        148.   Facebook's acquisition of WhatsApp followed a similar pattern. WhatsApp began as

9    mobile application that displayed user statuses in an address book on a smartphone. However,

10   WhatsApp exploded in popularity when Apple introduced "push notifications" for the iPhone,

11   allowing developers to ping app users even when they weren't using the app. This feature became a

12   form of instant messaging, enabling users to broadcast messages to connections within a user's

13   social network, which was built from their phone's contact list. Because WhatsApp used the mobile

14   phone's internet connection rather than text messages, the app allowed users to avoid text

15   messaging fees entirely. WhatsApp's ability to send messages to any user with a phone using the

16   internet was its most sought-after feature.

17       149.   As WhatsApp's popularity began to rise in the early 2010s, Facebook harvested user

18   engagement data from Facebook's Onavo spyware in order to carefully track WhatsApp. The data

19   reported that WhatsApp was rivaling Facebook's own Messenger product, and held third place in

20   terms of user reach among mobile messenger apps for iPhone in the U.S. as of April 2013.

21   Facebook used Onavo's data to track messages sent through WhatsApp, which more than doubled

22

23 _____

24 [104] Production of Facebook to H. Comm. on the Judiciary at FB-HJC-ACAL-00101438, Feb. 13, 2012, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

25 [105] *Id.* at FB-HJC-ACAL-00101438–39.

26 [106] *Id.* at FB-HJC-ACAL-00101440.

27

28 CLASS ACTION COMPLAINT

messages on Facebook's own mobile product. This same Onavo data showed massive engagement among WhatsApp users, placing it in fifth place behind Facebook's own core product; Facebook's newly acquired Instagram; Twitter; Foursquare; and Snapchat. WhatsApp, although lacking Facebook's market reach, was drawing from the same pool of limited attention, and it exposed a major vulnerability in Facebook's business model. WhatsApp threatened Facebook's business, including the barriers to entry and network effects protecting Facebook's dominance—and because of Onavo, Facebook knew that WhatsApp was a direct threat to Facebook's monopoly power.

150.    Facebook then sought to remove WhatsApp as a competitor in order to ensure that Facebook retained its monopoly power in the Social Network Market. Facebook used the insights it had gained from Onavo's data surveillance technology to purchase WhatsApp in 2014 for close to $22 billion, well above its initial bid of $16 billion. The transaction made no economic sense for Facebook, other than foreclosing competition in the social media and Social Network Markets and protecting Facebook's monopoly power. WhatsApp's revenues were a meager $10.2 million in 2013. Its six-month revenue for the first half of 2014 totaled $15.9 million, and the company had incurred a staggering net loss of $232 million in that same period. Facebook had paid twenty billion dollars—thousands of times WhatsApp's revenues—to acquire a money-losing company that created software functionality Facebook itself already had as part of its own products, and could easily build from scratch for a fraction of the cost of the acquisition.

**Snapchat**

151.    Facebook's acquisition of Instagram allowed Facebook to exclude third-party apps that provided photo and video sharing functionality from Facebook's platform. If an image sharing or video app contained an important feature, Facebook simply cloned it, thus paving the way for

CLASS ACTION COMPLAINT

1   excluding a competitive rival from its platform, while simultaneously taking away that rival's share

2   of users. And high level Facebook executives were acutely aware of this strategy.[107]

3       152.    For example, by 2012, the photo-sharing app Snapchat began had grown in

4   popularity among consumers. Founded by Evan Spiegel, Snapchat allows users on that platform to

5   send each other communications—including text, photos, and videos—that appear only for a fixed

6   period of time and then disappear.[108] Drawn by Snapchat's privacy appeal, users began to flock to

7   Snapchat.

8       153.    Facing a competitive threat from Snapchat, Facebook engaged in its usual "copy,

9   acquire, kill" strategy in an attempt to annihilate Snapchat. To formulate that strategy, Facebook

10   relied on data it obtained from Onavo.[109]

11       154.    In December 2012, Facebook launched "Poke," a standalone app designed to allow

12   users to send photos, videos, or Facebook messages to each other that expire after a few seconds.[110]

13   But to Facebook, the possibility of competing with Snapchat on the merits provided insufficient

14   guarantee that Facebook's monopoly position would be secure. So mere days before Facebook

15   launched Poke, Zuckerberg met with Spiegel, Snapchat's founder, in Los Angel[111] During the

16

---

17   [107] Executives such as Zuckerberg, Sheryl Sandberg, Facebook's Chief Operating Officer, and Sam
18   Lessin, Facebook's Product Management Director, expressly endorsed "cloning" other competing
     platforms' popular features. *See* House Report, *supra*, at 163.

19   [108] Srinivasan, *supra*, at 53.
20
21   [109] Karissa Bell, *"Highly confidential" documents reveal Facebook used VPN app to track
     competitors*, Mashable, Dec. 5, 2018, available at: https://mashable.com/article/facebook-used-
     onavo-vpn-data-to-watch-snapchat-and-whatsapp/.
22

23   [110] Josh Constine, *Facebook Launches Snapchat Competitor 'Poke', An iOS App for Sending
     Expiring Text, Photos, And Videos*, TechCrunch, Dec. 21, 2012, available at:
24   https://techcrunch.com/2012/12/21/facebook-poke-app/.

25   [111] J.J. Colao, *The Inside Story Of Snapchat: The World's Hottest App Or A $3 Billion Disappearing
     Act?*, Forbes, Jan. 20, 2014, available at https://www.forbes.com/sites/jjcolao/2014/01/06/the-
26   inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-

27                                          - 50 -
28                              CLASS ACTION COMPLAINT

1   meeting, Zuckerberg described Facebook's soon-to-be-released Poke app to Spiegel. Spiegel has

2   described Zuckerberg's representations during the meeting as follows: "It was basically like, 'We're

3   going to crush you.'"[112]

4       155.    After the meeting and following Facebook's launch of Poke, Facebook made

5   additional overtures to Snapchat in an attempt to cement its top-of-the-ladder status.[113] Facebook

6   ultimately offered $3 billion to acquire Snapchat. Facebook's $3 billion offer made clear that

7   Facebook was willing to pay a premium over Snapchat's then-existing market value with the added

8   value of neutralizing a possible threat to Facebook's market dominance.

9       156.    Snapchat rejected Facebook's offer, and Facebook responded by copying *even more*

10   of Snapchat's features that are popular with consumers. For example, Snapchat's "Stories" feature

11   allows Snapchat users to post a collection of images and video in a rapid string that other Snapchat

12   users may view for 24 hours. In 2016, Facebook (through Instagram) launched its own feature—

13   also called "Stories"—which is "nearly identical" to Snapchat's version.[114] By April 2017,

14   Facebook's "Stories" feature on Instagram had become more popular than Snapchat's version,

15   crippling one of Facebook's largest rivals.[115]

16

17

18

19   act/?utm_campaign=forbestwittersf&utm_medium=social&utm_source=twitter&sh=7236882067d2

20   .

21   [112] *Id.*

22   [113] *Id.*

23   [114] Casey Newton, *Instagram's new stories are a near-perfect copy of Snapchat stories*, The
24   Verge, Aug. 2, 2016, available at https://www.theverge.com/2016/8/2/12348354/instagram-
     stories-announced-snapchat-kevin-systrom-interview.

25   [115] Kaya Yurieff, *Instagram's Snapchat clone is more popular than Snapchat*, CNN Business
26   Apr. 13, 2017, available at https://money.cnn.com/2017/04/13/technology/instagram-stories-
     snapchat/index.html.

27
CLASS ACTION COMPLAINT
28

**Other Examples of Facebook's "Copy, Acquire, Kill" Strategy**

157.    In addition to the examples described herein, Facebook has employed its "copy, acquire, kill" strategy against other would-be competitors, and the extent to which it did so based on deceptively-obtained user data was not clear until the last two years. For example, shortly after "Houseparty"—a social network that referred to itself as "the internet's living room"—turned down an acquisition offer from Facebook, Facebook announced that its Messenger app would become a "virtual living room." Houseparty's active user base fell by half between 2017 and 2018.

158.    As another example, Facebook acquired Giphy for $400 million in May 2020. Although Giphy's primary function is to allow users to share GIFs[116] online and through messaging apps, the transaction will also give Facebook competitive insights into other messaging apps. One commenter said, "While you may successfully block trackers like the Facebook ad pixel following you around online, or even delete your Facebook account, the majority of us wouldn't suspect we're being monitored when we're sending funny images to friends."[117]

159.    In addition, Facebook has sometimes acquired companies without the goal of incorporating them into its own business, but rather, simply to eliminate the competitor, a practice referred to as "catch and kill." For example, Facebook acquired "tbh"—an anonymous social media app—in October 2017. It then shut the app down less than a year later, having made little effort to maintain the platform.[118]

---

[116] A "GIF" is a compilation of still images, akin to a flipbook, played in sequence to create a short animated sequence

[117] Owen Williams, *How Facebook Could Use Giphy to Collect Your Data*, ONEZERO, May 15, 2020, available at https://onezero.medium.com/how-facebook-could-use-giphy-to-collect-your-data-70824aa2647b.

[118] *See* Kaya Yurieff, *Facebook Shutters the Teen App it Just Bought*, CNN Business, July 3, 2018, available at https://money.cnn.com/2018/07/03/technology/facebook-tbh-app-shut-down/index.html.

CLASS ACTION COMPLAINT

160.     Facebook's acquisition conduct is part of an ongoing attempt to entrench its market power in the Social Network Market. Facebook's strategy was made possible due to the social data that Facebook obtained as it acquired its monopoly. And Facebook has used that data in order to copy, acquire, or kill competitors, instead of competing with them by providing enhanced data privacy protections to consumers.

**Harm to Competition in the Social Network Market.**

161.     Facebook's anticompetitive practices described above have harmed and continue to harm competition the Social Network Market in the United States.

162.     Facebook is dangerously close to obtaining, or has obtained, monopoly power in the Social Network Market in the United States, and it has wielded that power to anticompetitively foreclose competition.

163.     Facebook's deception of consumers has harmed, and continues to harm, competition. In many markets, the advantage of consumer deception quickly dissolves once the deception is uncovered. But the direct and indirect network effects inherent in the Social Network Market create markets with strong network effects and high barriers to entry. Because of unduly high switching costs, users cannot simply switch to a competitor once the dominant player's deception is exposed, even though they wanted to do so, as evidenced by the "#DeleteFacebook" movement after the revelations regarding Cambridge Analytica in 2018.

164.     Facebook's deception about its lack of privacy protections induced a ground swell of users to join Facebook because of Facebook's avowed privacy appeal. But once a critical mass of users joined and continued to grow, Facebook reneged on this vow and continued to shut down competition using its monopoly power. Because of high switching costs—including the possibility of losing contact with friends, family and acquaintances, an inability to access data that Facebook users have spent years or more inputting into Facebook, and the time and opportunity cost of

**CLASS ACTION COMPLAINT**

starting over with a competitor—and the lack of viable alternatives as a result of Facebook's deception, consumers are now trapped. As a result, Facebook has cheated its way to the finish line in the race for dominance without being the best competitor. Instead of providing consumers a way out, such as alternatives to Facebook, the Social Network Market help to lock in Facebook's unfair advantage. Facebook's acquisition conduct also has harmed, and continues to harm, competition. Facebook built and maintained its monopoly over the Social Network Market by exploiting deceptively obtained user data to target competitive threats, which Facebook then proceeded to acquire, copy, or kill. Facebook tracked its users across the internet, often without permission, to identify companies that might threaten its monopoly. Facebook then used a pattern of discriminatory data access to destroy potential competitors or force them to sell at a discount. Facebook used its data advantage not to run faster, but to kneecap the competition. That approach is not surprising given the win-at-all-costs culture at Facebook.

165.    Facebook's anticompetitive strategy harmed competition in the Social Network Market. As detailed herein, Facebook's strategies made it nearly impossible for competitors—both nascent and established—to challenge Facebook's monopoly by competing with Facebook on data privacy protections or by building a higher quality social network.

166.    But for Facebook's anticompetitive practices, consumers would have had more options in the social Network Market for connecting with other users. Those companies would have created social networks and social media platforms that competed with Facebook on the merits of data privacy protections and social network and platform quality, without being dependent on Facebook for comprehensive social media network data. Because Facebook anticompetitively restrained competition in its efforts to acquire and obtain social media and social network monopolies, competition along the dimensions of user privacy and product quality was foreclosed. Ultimately, consumers suffered, and continue to suffer, as a result of Facebook's wantonly anticompetitive conduct.

**Direct and Quantifiable Injury to Consumers**

167.    Facebook's anticompetitive practices described herein have harmed, and continue to harm, consumers in the Social Network Market in the United States.

168.    Facebook's anticompetitive foreclosure of competition has harmed consumers in many ways. When agreeing to Facebook's Terms of Service, consumers agree to give up things of material value: personal information and attention. Facebook then sells for money, measurable in quantifiable units, its users' information and attention to third parties, including advertisers. But for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated competition, consumers would have had more choices in the Social Network Market, instead of the few, if any, they have today. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased incremental value, that is quantifiable in measurable units, in return for consumers' data. Otherwise, consumers would have given their data and attention to other platforms, which would have provided consumers increased incremental value. Consumers would have received the fair market value for their data and attention. That value was artificially decreased by Facebook's anticompetitive conduct.

169.    Absent Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social media platform quality. Users could have benefitted from Facebook's social media network without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising. Similarly, users could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as interoperability between platforms and portability of users' data.

- 55 -

170.     If Facebook had disclosed the scope of the data it collected and the level of fine-grained targeted marketing that it enabled, consumers would have benefitted from competition in the Social Network Market, resulting in a better Facebook or better alternatives and lower consumer costs in the form of information and attention. Instead, Facebook has artificially stifled innovation, thrusting on consumers a product of reduced-quality and leaving consumers with no meaningful alternative.

171.     If Facebook had not used its social media monopoly to target its competition for destruction, consumers would have benefitted from more competition, and hence more options and lower costs, in the Social Network Market. Even elected officials have recognized that absent Facebook's anticompetitive acquisition strategy, Facebook would have had to compete on privacy issues, benefiting consumers. As United States Representative Ro Khanna stated, "Imagine how different the world would be if Facebook had to compete with Instagram and WhatsApp. That would have encouraged real competition that would have promoted privacy and benefitted consumers."[119]

172.     Because Facebook engaged in the anticompetitive practices described above, consumers suffered substantial, cognizable, and quantifiable economic harm. Unless these acts are enjoined, consumers will continue to suffer harm caused by Facebook's anticompetitive practices.

**ACCRUAL OF CLAIM, EQUITABLE TOLLING, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND ASCERTAINMENT OF DAMAGES**

173.     Plaintiff did not discover the existence of the anticompetitive acts alleged herein until, at the earliest, March 17, 2018. As the House Antitrust Subcommittee recently explained, "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of scandals involving large-scale data breaches or privacy incidents such as Cambridge Analytica."[120]

---

[119] United States Representative Ro Khanna, Twitter, Jan. 25, 2019, available at https://twitter.com/RepRoKhanna/status/1088850988218413058.

[120] House Report, *supra*, at 54.

CLASS ACTION COMPLAINT

It was not until the media uncovered the details of the Cambridge Analytica scandal on March 17, 2018, that consumers began to discover Facebook's anticompetitive practices that harmed consumers and that would have enabled consumers to raise the claims presented in this action. Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22, 2018, that consumers learned of the additional facts regarding Facebook's anticompetitive practices necessary for consumers to raise the claims presented in the action.

174.    Nor could Plaintiff or any class member have discovered, through the exercise of reasonable diligence, the existence of the anticompetitive acts alleged herein until, at the earliest, March 2018. That is because, as the House Antitrust Subcommittee has recognized, "nuances in privacy terms are relegated to investigative journalists to discover and explain."[121] The subsequent investigative reporting that brought to light Facebook's systematic deception and commercial surveillance was not made public until, at the earliest, March 17, 2018, following the Cambridge Analytica scandal. Accordingly, the statute of limitations should be equitably tolled to March 2018. As such, all of the anticompetitive conduct described in this complaint presents timely claims, including Facebook's deception and acquisition conduct going back to before it achieved its social media monopoly.

175.    Facebook fraudulently concealed its deceptive practices and commercial surveillance efforts, including the extent of its data privacy practices and anticompetitive acquisition strategy. As a result, Plaintiff and Class members were unaware of Facebook's unlawful conduct alleged herein. Facebook affirmatively and fraudulently concealed its unlawful conduct by, *inter alia*:

a)      Agreeing to a settlement with the FTC in 2011 which "barred [Facebook] from making misrepresentations about the privacy or security of consumers' personal information[.]"

b)      Publicly misrepresenting, before and after its 2011 settlement with the FTC,

---

[121] *Id.*

- 57 -
CLASS ACTION COMPLAINT

that it was protecting users' privacy. Examples of such public statements include:

c)      Mark Zuckerberg's May 2010 statement on NPR that "There's this false rumor that's been going around which says that we're sharing private information with applications and it's just not true."

d)      Mark Zuckerberg's November 2011 statement on his own Facebook page that "everyone needs complete control over who they share with at all times."

e)      Mark Zuckerberg's November 2011 statement on his own Facebook page regarding the 2011 FTC Settlement that the settlement "means we're making a clear and formal long-term commitment to do the things we've always tried to do and planned to keep doing –giving you tools to control who can see your information and then making sure only those people you intend can see it."

f)      Facebook's statement to shareholders in its IPO filing with the Securities and Exchange Commission, indicating that "[w]e also believe that giving people control over what they share is a fundamental principle[.]"

g)      Mark Zuckerberg's June 8, 2013 statement, posted on Facebook's Newsroom, regarding Edward Snowden's allegations of government surveillance: "We will continue fighting aggressively to keep your information safe and secure."

h)      Mark Zuckerberg's March 2014 statement on his own Facebook page responding to allegations that the National Security Agency posed as Facebook during a controversial surveillance program: "To keep the internet strong, we need to keep it secure. That's why at Facebook we spend a lot of our energy making our services and the whole internet safer and more secure. . . . Together, we can build a space that is greater and a more important part of the world than anything we have today, but is also safe and secure. I'm committed to seeing this happen, and you can count on Facebook to do our part.

i)      Facebook's statement in its 2016 10-K filing that while "some of our developers or other partners, such as those that help us measure the effectiveness of ads,

CLASS ACTION COMPLAINT

may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook[,]" Facebook only "provide[s] *limited information* to such third parties *based on the scope of services* provided to us."

      j)    Mark Zuckerberg's March 2016 public statement in response to a statement issued by its subsidiary, *WhatsApp*, assuring that "Facebook stands with many technology companies to protect you and your information."

      k)    Mark Zuckerberg's March 2018 statement following news outlets' reporting on the Cambridge Analytica scandal that "[w]e have a responsibility to protect your data, and if we can't then we don't deserve to serve you."

      176.    Plaintiff and the class members did not discover, nor could they have discovered through reasonable diligence, that Facebook was violating the antitrust and other laws until less than four years before this litigation was initially commenced. Facebook did not tell Plaintiff or other Class members that it was violating its 2011 Settlement with the FTC, deceiving consumers and selling their data to extract revenue from third parties, or exploiting consumers' trust by surveilling them and using their data to identify competitors to "acquire, copy, or kill." To the contrary, Mark Zuckerberg—Facebook's founder, Chief Executive Officer, and public face— repeatedly represented otherwise. Indeed, in announcing its largest-ever $5 billion fine against Facebook following the Cambridge Analytica scandal, the FTC explained that while Facebook "encourages users to share information on its platform" by "promis[ing] users they can control the privacy of their information," Facebook "repeatedly used deceptive disclosures and settings to undermine users' privacy preferences[.]"

      177.    In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiff and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

      178.    Since the start of the class periods, Facebook has committed continuing violations of

the antitrust laws, resulting in monetary injury to Plaintiff and Class Members. As described herein, Facebook has engaged in a pattern of independent misrepresentations to users, designed to acquire, maintain, and prolong Facebook's monopoly position. Similarly, Facebook has weaponized its users' data as a part of its serial acquisition strategy to "acquire, copy, or kill" its competitors. Each of these injurious acts were separate and independent overt acts during the limitations period that were new and independent acts that inflicted new and accumulating injuries on consumers. Each of Facebook's instances of deception as to its data privacy practices and commercial surveillance over time were acts new and independent from its past issues with data privacy and commercial surveillance. Facebook's continued exposure of private information to app developers, advertisers, and other third parties leading up to 2018 and its anticompetitive acquisition practices were additional, independent, and overt acts that harmed competition and inflicted new and accumulating economic injuries on consumers.

179.    Moreover, Plaintiff's and Class members' harms were not ascertainable— sufficient to give rise to the claims presented herein—more than four years prior to the date that this action was first commenced. Since the harm that Plaintiff and Class members allege had not crystallized more than four years prior to the date that this action was initiated, the antitrust claims presented herein are timely.

**CLASS ACTION ALLEGATIONS**

180.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

181.    Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiff asserts claims on behalf of the following Class: All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action. Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this

CLASS ACTION COMPLAINT

matter and the members of their immediate families and judicial staff.

182.   Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

183.   This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of rule 23(b)(3). Plaintiff seeks to represent an ascertainable Class, as determining inclusion in the class can be done through Facebook's own records.

184.   Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Class numbers at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

185.   Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including:

    a)   Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

    b)   Whether Facebook's acquisition conduct was anticompetitive;

    c)   Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

    d)   Whether Facebook is a monopolist in the Social Network Market;

    e)   Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

    f)   Whether Facebook's foreclosure of competition in the Social Network Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

    g)   Whether consumers would have had more options and competition amongst social media companies if Facebook would have revealed the full extent of its data

privacy practices and commercial surveillance long ago;

h)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Network Market in the United States;

i)      Whether Facebook's anticompetitive conduct should be enjoined or whether other appropriate equitable relief, including ordering Facebook to divest assets or submit to more invasive third-party audits of its privacy practices and commercial surveillance.

186.    Plaintiff is a member of the putative Class. The claims asserted by Plaintiff in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

187.    Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Class, as his interests are coincident with, not antagonistic to, the other members of the Class.

188.    Plaintiff has retained counsel competent and experienced in both antitrust and class action litigation.

189.    Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be unlikely that many members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

190.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual

CLASS ACTION COMPLAINT

actions would create.

191.    In the alternative, the Class should be certified because:

a)    The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Facebook;

b)    The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

c)    Facebook has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

## INTERSTATE TRADE AND COMMERCE

192.    Plaintiff realleges and incorporates by reference herein all the allegations contained above.

193.    Facebook's anticompetitive conduct has taken place in, and negatively affected the continuous flow of interstate trade and commerce in the United States in that, *inter alia:*

a)    Facebook has provided a Social Network and platform and has exchanged consumer information and attention with advertisers and consumers throughout the United States;

b)    Facebook has used instrumentalities of interstate commerce to provide Social Network services to consumers and advertisers throughout the United States;

c)    In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

d)    The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Facebook has inflicted antitrust injury by artificially raising the cost to

consumers of using its platform, in terms of personal information and attention, by providing reduced user privacy protections to consumers in exchange for their personal data, and by artificially reducing consumer choice and competition in the Social Network Market in the United States.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2
### MONOPOLIZATION OF THE SOCIAL NETWORK MARKET

194.    Plaintiff realleges and incorporates by reference herein all the allegations contained above.

195.    Facebook has willfully acquired and maintained monopoly power in the relevant Social Network Market. There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements. Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and Social Network quality than would occur in a world where Facebook had not illegally monopolized the Social Network Market. Facebook has the power to control prices and exclude competition in the Social Network Market.

196.    By multiple measures, Facebook has dominant market share in the Social Network Market. More than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

197.    High barriers to entry, high switching costs, and strong direct and indirect network effects along with substantial investment capital make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Network Market in the United States to compete effectively with Facebook.

198.    Facebook has willfully acquired and maintained monopoly power in the Social Network Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct

includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

199.   By eliminating competition and obtaining and maintaining monopoly power over the Social Network Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

200.   Facebook's destruction of competition caused antitrust injury to Plaintiff and Class members by decreasing compensation and lowering value for consumers, who would have received better value in the but-for world where Facebook competed on the merits. Plaintiff and the Class were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

201.   During the relevant period, Plaintiff and the Class members gave Facebook their personal data and attention in exchange for the use of its social media network. As a result of Facebook's illegal conduct, Plaintiff and other Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

202.   There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

203.   Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

204.   Facebook's conduct has had a substantial effect on interstate commerce.

205.   Plaintiff and Class members have been, and will continue to be, injured in their

- 65 -
CLASS ACTION COMPLAINT

property as a result of Facebook's conduct.

206.     Plaintiff and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

207.     Plaintiff and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

## COUNT II - VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET

208.     Plaintiff realleges and incorporates by reference herein all the allegations contained above.

209.     With respect to the Social Network Market, Facebook has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers through deception to systematically destroy any and all competition.

210.     Facebook's conduct has had an anticompetitive effect in the Social Network Market.

211.     Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

212.     Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Social Network Market.

213.    Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Network Market.

214.    Facebook's conduct has had a substantial effect on interstate commerce.

215.    Plaintiff and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

216.    Plaintiff and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

217.    Plaintiff and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**COUNT III - UNJUST ENRICHMENT, CALIFORNIA COMMON LAW**

218.    Plaintiff realleges and incorporates by reference herein all the allegations contained above.

219.    In the Facebook Terms of Service, each Class member and Facebook have agreed "that the laws of the State of California will govern these Terms and any claim [against Facebook], without regard to conflict of law provisions."

220.    Facebook has been unjustly enriched through its misconduct as alleged herein.

221.    Plaintiff and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

222.    These benefits are quantifiable in measurable units. Facebook sells access to its

1  users' data, time, and attention to third parties—including advertisers and app developers—for

2  discrete monetary amounts. In 2019, for example, Facebook collected $70.7 billion in revenue,

3  almost entirely from allowing companies to serve ads to its users.

4       223.    Facebook appreciated and had knowledge of the fact that Plaintiff and Class

5  members conferred these benefits on it. For example, after Facebook's involvement in the

6  Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg

7  explicitly recognized that Plaintiff and Class members conferred on Facebook the benefit of their

8  data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve

9  to serve you." Moreover, in 2018 Facebook earned an average of roughly $110 in ad revenue per

10  American user. This calculation, however, ignores what it costs to collect, analyze, and market user

11  data. According to the balance sheet on file with the SEC, Facebook earned $55.8 billion worldwide

12  in 2018, virtually all of it from targeted advertising. Facebook also reported that relevant costs came

13  to $20.6 billion. That implies that the value of its users' personal information was equivalent to

14  $35.2 billion, or 63 percent of Facebook's earnings.

15       224.    Facebook acquired these benefits from Plaintiff and Class members through

16  misrepresentation and deception. Facebook induced Plaintiff and class members to join Facebook

17  based on the promise of stringent privacy protections. All the while, Facebook concealed the scope

18  of the data it harvested from Plaintiff and Class members and brokered to third parties. Nor did

19  Facebook reveal the manner in which it weaponized Plaintiff's and Class members' data to "copy,

20  kill, or acquire" Facebook's rivals.

21       225.    As a result of Facebook's receipt of the direct benefits of Plaintiff's and Class

22  members' data, time, and attention, Facebook was able to destroy competition, enriching itself at

23  the expense of Plaintiff and Class members. Although Plaintiff and Class member conferred on

24  Facebook the direct benefits of their data, time, and attention, Plaintiff and Class members have

25  been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately

26  compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to

27                                                                        - 68 -

28

accept Facebook's services, which are of inferior quality, with no meaningful alternative.

226.    Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. It would be unfair, unscrupulous, unjust, and inequitable to allow Facebook to retain the value it derived from the direct benefits that Plaintiff and Class members conferred upon it.

227.    To the extent that it is required—and solely in the alternative—Plaintiff and Class members have no other adequate remedy at law available.

228.    Plaintiff and Class accordingly seek disgorgement of all of Facebook's profits resulting from the wanton misconduct alleged herein.

**COUNT IV - VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

229.    Plaintiff realleges and incorporates by reference herein all the allegations contained above.

230.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200, *et seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

231.    Facebook has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Facebook, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

232.    Not only is there a California choice-of-law provision in Facebook's Terms of Service, but also, at all pertinent times, the conduct complained of took place in, and has emanated from, California.

233.    Facebook users, including the plaintiff, are individuals who lack sophistication and bargaining power. Facebook users are also consumers.

234.    Facebook's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Facebook has violated the unlawful prong of the UCL.

235.    Facebook's conduct has harmed its users, competition, and the public generally. Plaintiff and the Class Members give up something of material value when agreeing to Facebook's Terms of Service: their personal information and their attention. User information and attention is then sold in measurable units to advertisers in exchange for money. Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service. As Facebook's co-founder explained, "[Facebook] is not actually free, and it certainly isn't harmless. . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap."

236.    Facebook's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. More specifically:

(a)    The acts or practices alleged in this complaint violate the unfair prong of the UCL because the injuries complained of herein are substantial: Facebook acquired substantial benefits from Plaintiff and Class members through creating monopolization of the social media platforms. Facebook induced Plaintiff and Class members to join Facebook based on the promise of stringent privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiff and Class members and brokered to third parties.

(b)    As a result of Facebook's receipt of the direct benefits of Plaintiff's and Class members' data, time, and attention, Plaintiff and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

(c)    Facebook's business practices are also unfair because it offends the nation's antitrust policies as alleged herein. They are immoral, unethical, oppressive, and unscrupulous because they are a function of the abuse of Facebook's market power as

alleged herein; and

(d)   Facebook's behavior is also unfair because it violates public policy that is tethered to this country's statutory antitrust regulation, as expressed in part in the Sherman Act. In sum, for all or any of these reasons, Facebook has violated the unfair prong of the UCL.

237.   Plaintiff and the Class Members are entitled to recover restitution.

238.   Plaintiff is still a current user of Facebook and is also entitled to injunctive relief to prevent Facebook from persisting in its unlawful, inequitable, and unjustified behavior to his and the Class members' detriment, with such an injunction requiring Facebook to: (i) halt its continuing wrongful acts described herein; (ii) engage third-party auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition conduct, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) divest assets, such as WhatsApp, Instagram, and its Onavo technology, that tend to substantially entrench Facebook's monopoly power in a timely and complete manner. *See*, *e.g.*, Cal. Bus. & Prof. Code § 17203.

## COUNT V - VIOLATION OF THE CARTWRIGHT ACT, Cal. Bus. & Prof. Code 16700 *et seq.*

239.   Plaintiff realleges and incorporates by reference herein all the allegations contained above.

240.   Throughout the Class Period, Facebook engaged in systematic and continuous conduct with the purpose of (i) unreasonably restricting trade and commerce, and (ii) excluding potential competitors from the Social Network Market. Facebook achieved these anticompetitive purposes by excluding or acquiring any potential competitors to Facebook's business. Facebook's conduct violated Cal. Bus. & Prof. Code §§ 16700 *et seq.* (the "Cartwright Act").

241.   The Cartwright Act applies to the anticompetitive, price-fixing, trade-restraining conduct of a single firm in certain circumstances where a trader uses coercive tactics to impose

- 71 -

1    restraints on uncooperative businesses.

2        242.    Facebook's actions alleged herein, individually and collectively, were unlawful

3    combinations within the meaning of the Cartwright Act. The effect of these unlawful combinations

4    was to exclude competitors from the Social Network and Social Media Markets, reinforce and grow

5    Facebook's dominance and ability to extract anticompetitive profits (a perpetual cycle that will

6    continue unless Facebook is enjoined), and—fundamental to this action—cause Facebook's

7    dominance of the Social Network and Social Media Markets.

8        243.    At all relevant times, Facebook intended to form and formed one or more trusts

9    through a combination or conspiracy to accomplish purposes prohibited by and contrary to the

10   public policy of the State of California.

11       244.    Facebook's actions constitute prohibited restraints on competition in violation of Cal.

12   Bus. & Prof. Code §§ 16720 *et seq.*

13       245.    Facebook willfully acquired and maintained monopoly power in the relevant Social

14   Network Market in violation of Cal. Bus. & Prof. Code § 16727.

15       246.    As a direct result of Facebook's unlawful conduct, Plaintiff and the Class members

16   were injured due to Facebook's maintenance of a Social Network Market monopoly.

17       247.    Plaintiff and other Class members are "persons" as defined in Cal. Bus. & Prof. Code

18   § 16702.

19       248.    Facebook's conduct violates the Cartwright Act.

20       249.    These violations are continuing and will continue unless enjoined by the Court.

21                   **PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiff Garvin, on behalf of herself and the Class, seeks the

23   following relief:

24       A.    An order certifying this action as a class action under Fed. R. Civ. 23, defining the

25   Class as requested herein, finding that Plaintiff is a proper representative of the Class requested

26   herein, and appointing Plaintiff's counsel as Class Counsel.

27

28

- 72 -

CLASS ACTION COMPLAINT

B.      Injunctive and other equitable relief as is necessary to protect the interests of the Class, including: (i) an order prohibiting Facebook from continuing to engage in the wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition conduct, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring Facebook to divest assets, such as WhatsApp, Instagram, and its Onavo technology, that tend to substantially entrench Facebook's monopoly power in a timely and complete manner.

C.      Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and members of Class.

D.      Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre- and post-judgment interest on any amounts awarded, for corrective advertising to ameliorate consumers' mistaken impressions created by Facebook's anticompetitive conduct.

E.      Declaratory relief, including but not limited to a declaration and judgment that Facebook's conduct as alleged herein violates the laws alleged herein.

F.      Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 15, 2021                  Respectfully submitted,
                                          */s/ Dennis Stewart*
                                          Dennis Stewart (SBN 99152)
                                          **GUSTAFSON GLUEK PLLC**
                                          600 B Street
                                          17th Floor
                                          San Diego, CA 92101
                                          Telephone: (619) 595-3299
                                          dstewart@gustafsongluek.com

CLASS ACTION COMPLAINT

Daniel E. Gustafson
Daniel C. Hedlund
Catherine K. Smith
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
csmith@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Mark J. Tamblyn
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mjt@wexlerwallace.com

Simon B. Paris, Esq.
Patrick Howard, Esq.
**SALTZ, MONGELUZZI & BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Telephone: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

- 74 -

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dianne M. Nast, Esquire
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19106
Telephone: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT